**UNITED STATES of America,**

v.

**Frank ROMANO et al.**

**Crim. No. 10284.**

United States District Court
D. Connecticut.

March 10, 1961.

Harry W. Hultgren, Jr., U. S. Atty., Dist. of Conn., Hadley Austin, Asst. U. S. Atty., Hartford, Conn., for plaintiff.

W. Paul Flynn, Kopkind & Flynn, New Haven, Conn., for defendants in this motion.

ANDERSON, Chief Judge.

The defendants, Frank Romano, John Ottiano, Edward Romano and Antonio Vellucci, ask to have the indictment dismissed because the Grand Jury which returned it was drawn from a group of veniremen which was drawn from a jury list, selected in a manner which was contrary to law.

The bases for their complaint that the jury list was improperly made up are:

(1) that it contains too many persons from New London County,

(2) that it contains too few persons of Italian extraction,

(3) that it contains too few persons of the Jewish faith,

(4) that it does not disclose how many persons are of the Negro race,

(5) that there are included too many persons who attended college, and

(6) that there are included too many persons "of the self-employed or management segment of the community."

The defendants argue that if there is not enough before the court at this stage of their motion to warrant dismissal, then they should be permitted to investigate and examine every detail of the acts of the Jury Commissioners in selecting the jury list. The defendants concede that, while no one of the claimed deficiencies standing by itself might be sufficient to overcome the presumption that the jury list is a representative cross-section of the community, all of them together are enough to require a full investigation and examination of the steps taken in making the jury list.

In 1955 in connection with motions to dismiss indictments in cases then pending, this court dismissed an indictment and discharged the array (United States v. Silverman, D.C., 129 F.Supp. 496) and, thereafter, approved and adopted, for use of this court, a new system for making a jury list, which, with a few modifications, is the system under which the jury list of March 1, 1960, presently under attack, was produced. This new system is fully set out in the second Silverman case, United States v. Silverman, D.C., 132 F.Supp. 820. Reference is made to the Report to the Judicial Conference of its Sub-Committee on the Operation of the Jury System, January, 1960. See particularly page 89, et seq. That system has since been slightly modified in response to recent statutory changes. Title 28 § 1861 as amended September 9, 1957. The present selection procedure, which allows for those modifications, is set out in full in Appendix A, hereto attached.

In general outline, the pattern followed is that the Commissioners, from their own inquiry, make up, as they describe it, a list of citizens "from a variety of backgrounds whom [they] have reason to believe have a wide acquaintance in their respective communities and are esteemed therein as persons of good character, approved integrity and sound judgment and fair education," as "suggesters," whose function it is, under written instructions from the Jury Commissioners, to propose to them the names of persons in their communities who may be likely material for the jury list. The Jury Commission-

ers then, after inquiry of their own and careful consideration, determine those citizens who are qualified for inclusion in the jury list. A study of the system supplemented by the testimony of Mr. Earl, Clerk of the Court, and the only Jury Commissioner called to testify, makes it abundantly clear that at every step of the way the Jury Commissioners have been conscious of their duty to provide a jury list which is a representative cross-section of the qualified populace and from which no special class or group, particularly such as may be characterized by sex, race, creed, national origin or economic or social status, is systematically excluded. Frazier v. United States, 1948, 335 U.S. 497, 504, 69 S.Ct. 201, 93 L.Ed. 187; Ballard v. United States, 1946, 329 U.S. 187, 192–194, 67 S.Ct. 261, 91 L.Ed. 181; Thiel v. Southern Pac. Co., 1946, 328 U.S. 217, 220–221, 66 S.Ct. 984, 90 L.Ed. 1181; Glasser v. United States, 1942, 315 U.S. 60, 85–86, 62 S.Ct. 457, 86 L.Ed. 680.

The defendants expressly disclaim any accusation of such intentional or systematic exclusion by the Jury Commissioners. Moreover, they do not attack the system. The nub of their contention is that an analysis of (1) the names and addresses of the 905 persons on the jury list of March 1, 1960, (2) the 122 questionnaires of persons actually summoned as veniremen from that jury list subsequent to its establishment, (3) the 50 veniremen drawn for the choosing of the Grand Jury of May 3, 1960 and (4) the 23 members of the Grand Jury, itself, discloses reasonable ground to believe that the functioning of the system, in this instance, somehow went awry and produced a jury list which was not a representative cross-section of the qualified populace. They assert that, even if there is not enough evidence from this analysis to call for a dismissal of the indictment, there is enough to require a full and complete examination of all of the acts of the Jury Commissioners in selecting the jury list in question.

■ A court, however, should not be required to undertake a full scale in-vestigation of its jury panel or the array until it is suspect. Padgett v. Buxton-Smith Mercantile Co., 10 Cir., 1960, 283 F.2d 597, certiorari denied 1961, 81 S.Ct. 713; Windom v. United States, 10 Cir., 1958, 260 F.2d 384. The burden of showing that it is suspect lies with the defendants. Frazier v. United States, 1948, 335 U.S. 497, 69 S.Ct. 201.

In the present case the defendants offer the six grounds above mentioned as an accumulation of defects which, they claim, render the array suspect. These grounds and the evidence the defendants have offered to show their existence will be discussed seriatim.

■ First is the complaint that too many on the jury list are from New London County, which is the county in which some of the offenses are charged to have taken place. It also happens to be the county where one of the Jury Commissioners, Rear Admiral Miles H. Imlay, U.S.C.G. (Ret.), resides. On September 7, 1954 under the authority of 28 U.S.C.A. § 1864 and § 1865, this court, for the purpose of making a convenient and workable division between those towns in the district from which jurors would be summoned for service at terms held at New Haven and those from which jurors would be summoned for service at terms held at Hartford, designated the twelve most southerly towns in New London County as a part of the area chosen for the selection of jurors for the court at New Haven. Of the 905 persons on the March 1, 1960 jury list, 334 came from towns in New London County, 391 from towns in New Haven County, 146 from towns in Fairfield County and 34 from towns in Middlesex County. The defendants complain that the numbers from the counties, as they relate to each other, are out of proportion to the comparative population totals for the respective counties. But there is no rule which requires proportional representation from various geographical areas where, as in this case, the factor of numbers from a particular area, either standing alone or in connection with the other claimed bases for complaint, nei-

ther brings about a systematic exclusion of a group, such as those mentioned, nor contributes substantially to prevent the achievement of a fair cross-section of the qualified populace.

█ The second and third grounds for complaint, are that there are too few persons of Italian extraction and too few of the Jewish faith. The defendants' claim as to the sizes of these groups rests entirely on the defendants' own conclusions drawn from the spelling of names in the jury list. This is altogether too insubstantial and speculative a process to give it evidential recognition; and it is nothing upon which the court can find that there is a likely defect in the selection of the array. The questionnaires sent out by the Jury Commissioners do not include inquiry as to race, ethnic origin or religious faith.

The fourth basis of complaint is largely negative, as the defendants claim they do not know from the jury list how many Negroes are on it. There is no claim of systematic exclusion of Negroes and the court has observed Negroes on several panels drawn from the array in question. There is no evidence in support of this claim, either standing alone or in conjunction with the others, which would justify ordering a full investigation of the selection of the array.

█ The fifth claim alleges that there were 23 of the 50 veniremen summoned for the drawing of the Grand Jury, who had attended college; and of the 23 on the Grand Jury, 10 had attended college. These figures and proportions are all the result of the drawings. In Padgett v. Buxton-Smith Mercantile Co., supra, the Court said:

"As we see it, the exclusion of a group by chance selection in the drawing of a panel is no ground for suspicion of the exclusion of that group in the array. Something more must be shown. The stability of the jury system would be imperilled if a litigant could cast doubt upon the legality of the array by a showing that his particular group

was not represented or not proportionately represented on the panel from which the petit jury for his case was to be selected." [283 F.2d 599.]

Even if this proportion or the proportion of 40%, claimed by the defendants as a result of their examination of the 122 questionnaires, were assumed to be a fair reflection of the number on the jury list who "attended" a college, i. e. those who finished and were awarded degrees and those who dropped out along the way, such an assumption standing alone or with other evidence produced in support of this motion would furnish no reason for finding the jury list suspect.

█ The sixth claim is that there was on the Grand Jury, itself, only one person from what the defendants describe as the "workingman-union segment of society" and only 7 of that description among the 50 veniremen summoned for the drawing of the Grand Jury. Here again the proportion is the result of chance selection in the drawings; and this cannot be accepted as evidence of exclusion of a particular class or group or lack of a representative cross-section of the qualified populace. Although the defendants are seeking a complete investigation of all acts, records and correspondence of the jury commissioners, including all 905 questionnaires, the defendants, under their sixth claim, offered no evidence of relative numbers and made no complaint about the proportion of the subject group or class as it appeared in the 122 questionnaires which they did examine. Whether a juror is union or non-union is not disclosed by the questionnaires, and the characterization of this "class" is derived solely from the defendants' own conclusion based on what the jurors noted in the questionnaires as to the nature of their employment.

█ The court, therefore, concludes that the defendants have shown nothing which calls for a dismissal of the indictment or for a full scale investigation of the methods and means used for selecting the jury list of March 1, 1960.

The Jury Commissioners are entitled to, and have a duty to exercise their judgment and discretion in determining what is a representative cross-section of the community. The defendants' principal claim seems to be that to be "representative" there should exist in the array roughly the same proportion of members from the particular groups, the systematic or arbitrary exclusion of which is forbidden by the law, as each such group bears to the general qualified populace in the whole district. But the classes to be considered in making a representative cross-section are almost infinite in number and are not limited to sex, race, creed, national origin or economic or social status. These are not the only human characteristics. They are given emphasis in connection with the prohibition against systematic or arbitrary exclusion because the experience of the law is that these groups have been the subjects of discrimination. "Selecting Federal Court Jurors" by Merrill E. Otis, U.S.D.J. Published by Section of Judicial Administration of the American Bar Association, August, 1942. Of course, in cases where evidence of the characteristics of members of the jury list discloses little more than a token representation of a dominant or distinguishing trait of a substantial segment of the qualified populace, an inference may be drawn of the likelihood of arbitrary exclusion; and a full investigation of the selection of the array might well be called for. However, neither the quantity nor quality of the evidence offered in support of this motion furnish the grounds for such an extended inquiry in this case.

The motion is denied.

### Appendix A
### Selection of Jurors by the Jury Commission

The Jury Commission for the United States District Court for the District of Connecticut has adopted the following procedure for use in obtaining Grand and Petit Jurors.

#### I

(a) Each member of the Jury Commission selects from those areas of the District of Connecticut prescribed by Court Order of September 7, 1954, a number of citizens from a variety of backgrounds whom he has reason to believe have a wide acquaintance in their respective communities and are esteemed therein as persons of good character, approved integrity, sound judgment and fair education. The function of these citizens—hereinafter called "suggesters"—is to furnish to the Jury Commission the names of residents of their communities who, in their considered opinions, are qualified for jury service.

(b) An index card (Exhibit 1) is prepared for each suggester.

(c) The Jury Commissioners confer on their choices of suggesters. In this conference they exchange information on the qualifications of the suggesters selected by each; they eliminate duplications of names; and they survey the entire list to minimize the possibility that in their selection of suggesters they have inadvertently discriminated against any significant area or racial, religious, occupational or environmental group. When a suggester has been approved by both Commissioners, his index card is initialed by them. (See Exhibit 1).

(d) A letter (Exhibit 2) is sent to each suggester. This letter outlines in detail the points that the suggester must consider in making up his list of proposed jurors. Enclosed with this letter is a ruled form (Exhibit 2a) and a self-addressed envelope requiring no postage (Exhibit 2b) for use by the suggester in submitting his list of proposed jurors to the Jury Commission.

(e) The date on which the above letter and documents (Exhibits 2, 2a and 2b) are sent to the suggester is entered on his index card. (See Exhibit 1)

#### II

(a) When a list of names and addresses is returned by a suggester, such list is file-stamped as to the date received. The Jury Commissioners thereafter examine each list and when satisfied of its completeness as to date, signature, etc., they place thereon their initials and the

date of such examination. (See Exhibit 3).

(b) A file folder (Exhibit 4) is then prepared for the suggester's return. Such folders are kept in a filing cabinet marked "Suggesters."

(c) The date on which the suggesters return was received is marked on his index card as indicated in Exhibit 5.

(d) A letter (Exhibit 6) is sent to the suggester thanking him for his cooperation, and so marked on the card. (See Exhibit No. 5).

### III

(a) A form letter from the Judges of this Court (Exhibit 7) is sent to each person whose name appears on a suggester's list, together with a questionnaire (Exhibit 7a), designed to elicit information for use by the Jury Commissioners in their determination of whether or not the suggested person is eligible to serve as a Grand or Petit Juror. A self-addressed envelope which requires no postage (Exhibit 7b) is also enclosed for use by each prospective juror in returning his or her questionnaire.

(b) An index card (Exhibit 8) is prepared for the name of each person submitted by the suggester at the time Exhibits 7, 7a and 7b are mailed. This card includes the name and address of each such person, the suggester's initials, and the date the questionnaire was mailed. Such cards are kept in a file drawer labeled "Names of Prospective Jurors."

### IV

(a) When the questionnaire is returned by a prospective juror, it is file-stamped to show the date received. This date is inserted on the juror's index card as indicated in Exhibit 9. If the spelling of the name or the address on the questionnaire is different from that appearing on the index card, the index card is corrected—either by making a completely new index card or by altering the old one to coincide with the questionnaire.

### V

(a) The questionnaire of each prospective juror is examined by both Jury Commissioners.

(b) If any significant question has been left unanswered, a letter (Exhibit 10) is addressed to such prospective juror covering the return of the questionnaire for completion.

(c) In those instances where the Jury Commissioners consider that more information is desirable in conjunction with an answer given to any question of the questionnaire, [such as, for example, Question 11, relating to permanent disability impairing the person's capacity to serve as a juror], a special letter (Exhibit 11) requesting such additional information is sent to the prospective juror. In those instances where the Commissioners feel that correspondence with the prospective juror is not well designed to elicit the necessary information, either one or both of them will write to other sources or make telephonic or personal investigations.

(d) The Jury Commissioners meet in conference and, after considering all of the information available with respect to each prospective juror, determine whether or not such prospective juror meets all of the statutory standards for inclusion in the jury array. If he or she is accepted for jury service, it is so indicated by the Jury Commissioners on the face of the questionnaire (See Exhibit 12) and the date of the acceptance is entered on the juror's index card. (See Exhibit 13). If he or she is rejected, that fact and the reason for rejection is indicated on the face of the questionnaire, (See Exhibit 14), and the date of rejection is entered on the juror's index card. (See Exhibit 15).

(e) Separate files are maintained for the questionnaires of those who are accepted for jury service and those who are rejected. Corresponding indices are kept separately.

### VI

When directed by a Judge of this Court to establish a new jury array or to augment the existing array, the Jury Commissioners:

(a) Have a separate card (Exhibit 16) prepared for each accepted juror containing the name and address of each such.

juror. Hereafter these cards will be called "jury cards".

(b) Have a jury list prepared to correspond with the jury cards.

(c) Check the file of jury cards against the jury list to insure the accuracy of that list and its numerical sufficiency in terms of the minimum number of names required by the Judge's directing order.

(d) Take the jury box and jury cards to the Courtroom and there, in the presence of witnesses and with the Court Reporter recording the proceedings, fill the jury box by alternately placing jury cards into said box until all cards have been so placed.