UNITED STATES of America,
Plaintiff-Appellee,

v.

Ralph "Whitey" TROPIANO, Lawrence
R. Pellegrino and William Grasso,
Defendants-Appellants.

Nos. 702–704, Dockets 33092–33094.

United States Court of Appeals
Second Circuit.

Argued July 24, 1969.

Decided Nov. 26, 1969.

See also, D.C., 296 F.Supp. 284.

J. Daniel Sagarin, Asst. U. S. Atty. (Stewart H. Jones, U. S. Atty., District of Connecticut, on the brief), for appellee.

Abraham Glasser, New York City, for appellant Ralph "Whitey" Tropiano.

Howard T. Owens, Jr., Bridgeport, Conn. (Owens & Schine, Bridgeport, Conn., on the brief), for appellant Lawrence Pellegrino.

Ira B. Grudberg, New Haven, Conn. (Jacobs, Jacobs, Grudberg & Clifford, New Haven, Conn., on the brief), for appellant William Grasso.

Before WATERMAN and HAYS, Circuit Judges, BARTELS, District Judge.*

BARTELS, District Judge:

On March 27, 1968, the appellants were indicted in New Haven, Connecticut, in a four-count indictment, charging them with wilfully and knowingly attempting to and actually obstructing, delaying and affecting interstate commerce and the movement of supplies from outside Connecticut by extorting and attempting to extort property from certain refuse removal dealers by the wrongful use of threatened force, violence and fear, in violation of the Hobbs Act, 18 U.S.C.A. § 1951.[1] Counts 1, 2 and 3 of the indict-

---

\* Of the Eastern District of New York, sitting by designation.

1. The pertinent portions of Section 1951 read as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

ment charged substantive violations of the Hobbs Act, while Count 4 charged conspiracy under the same Act. Tropiano and Grasso were named only in Counts 1, 2, and 4, while Pellegrino was named in all counts. The Court ordered an acquittal of all appellants as to Count 2, and a severance as to Count 3 relating to Pellegrino alone.

After a trial of eighteen days, the jury on November 15, 1968, returned a verdict of guilty against all the appellants accused in Count 1, and against all, except Pellegrino, accused in Count 4—the conspiracy charge. Tropiano was sentenced to twelve years imprisonment on each count, to be served concurrently, and a $10,000 fine on Count 1; Grasso was sentenced to ten years imprisonment on each count, to be served concurrently, and a $7,500 fine on Count 1; and Pellegrino was sentenced to eight years imprisonment and a $5,000 fine on Count 1.

It is undisputed that Tropiano and Grasso together with Dolores Proto were partners in the C & A Refuse Removal Company (hereafter C & A), engaged in the business of collecting rubbish, with customers or "stops" in Milford, Connecticut; that Pellegrino was likewise engaged through B & L Carting Corporation in Bridgeport, Connecticut; and that Leonard Caron, with the help of his wife Ruth, ran a family-owned company under the name of Caron Refuse Removal, Inc., similarly engaged in the rubbish removal business in the Bridgeport area.

The thrust of the Government's case was that when Caron's company replaced C & A in servicing one or more of the C & A's Milford "stops," Tropiano, Grasso and Pellegrino, by threats of violence, forced Caron to cease and desist from attempting to take away any more C & A's Milford "stops" and to consent not to solicit any more business in that area. This contention rested almost entirely upon the testimony of Leonard Caron, supported in parts by the testimony of his wife and corroborated in peripheral areas by several other witnesses. The appellants charge, among other things that the testimony of Caron and his wife was incredible as a matter of law. It is thus in order to examine this testimony which, in essence, reveals the following:

### Jo-Nick's and Milford Rivet "Stops"

Caron moved to Milford in 1966 and decided that he would begin servicing Milford private refuse removal customers. At first he serviced two or three "virgin" accounts which had not been previously serviced. Then late in February, 1967, he began servicing the grocery store by the name of Jo-Nick's, located a block from his home, which prior thereto had been serviced by C & A. Thereafter, on March 2, 1967, Caron received a telephone call from Pellegrino, a competitor, at which time the latter stated that Grasso and Tropiano wished to speak to him. Caron invited them to his home but Pellegrino declined, arranging, instead, a meeting at Howard Johnson's restaurant for that evening. Pellegrino picked up Caron in his car and drove him to the restaurant, where Pellegrino introduced Tropiano and Grasso as owners of C & A and also as Pellegrino's partners and backers. At this meeting Grasso said that Jo-Nick's was his account, that Caron should leave it alone and that if Caron did not cooperate, Grasso would push him out of Milford—"way out if he needed to," and Tropiano said "We know how to take care of guys like you." Caron refused to accede. On the way home Pel-

(b) As used in this section—

 &ast; &ast; &ast; &ast;. &ast;

 (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

 (3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

legrino told Caron that he was crazy and that "these two men were not to be fooled with," that Caron was liable to get his "head broke or something similar to that." Two days later, on March 4th, Caron and his wife sought the advice of Lieutenant Donald Paige of the Connecticut State Police in Fairfield. Caron shortly thereafter removed the refuse container he had left at Jo-Nick's and discontinued service for approximately two weeks, until the middle of March, when he again resumed service of Jo-Nick's. The resumption of service resulted in a storm of phone calls from Grasso and Pellegrino, during which Grasso kept repeating that the customer was his and that Caron should keep away. Pellegrino again stated that Caron was "fooling with the wrong people." In one call Pellegrino told Mrs. Caron that her husband "was playing with a rough bunch of guys" and that she should tell him "to lay off before he got hurt."

By late March, Milford Rivet Company discontinued its arrangement of service in Milford with C & A and awarded the business to Caron, who began servicing the company on April 1, 1967. Grasso then attempted to induce other refuse removal dealers to exert pressure upon Caron to cease and desist his Milford activities. Accordingly, on April 3rd Grasso and Pellegrino visited Peter Bertase, who with his son-in-law William Lockwood was the owner of Call Peter, Inc., also in the refuse removal business. Grasso advised Bertase, "If I don't get (the stops) back, I'm going to do something about it" or "there would be trouble." He ordered Bertase to call Caron, which he did, attempting to induce Caron to surrender the "stop." Bertase informed Caron that he had a similar problem with Grasso when Bertase had taken five accounts from C & A and "out of five I got one. I gave four back."

### The BIRCA Meeting of April 7, 1967

Bridgeport Independent Refuse Collectors' Association (BIRCA) is a refuse collectors' trade and social organization in and around Bridgeport. Pellegrino was a member but Grasso and Tropiano were not. Pellegrino and Grasso caused a special meeting of this group to be called for April 7th by speaking to the president, William Lockwood. Caron with his father and two other members, Joseph Pauley and Charles Williams, attended this meeting in Fairfield, Connecticut, which was held at the garage of the Reliable Sanitation Company, a BIRCA member. On the way Caron stopped and picked up a one-way pocket radio transmitter from Connecticut State Police Trooper David Paige and Lieutenant Pat Carroll of the Fairfield Police Department for protective contact with the police. At the meeting Pellegrino introduced Grasso and Tropiano and turned the meeting over to Grasso, who told the members that Caron should keep away from his customers and that if the members did not cooperate to keep Caron out of Milford, he would purchase trucks and send them into Bridgeport with "enough muscle" to give the local people "a rough time." When Caron asserted his right to do business where he chose, Grasso said, to use Caron's words, "that where he comes from in New York, guys like me they knew how to take [care] of me; I would end up with either my arms broke or in the river," and that "you can stretch a rubber band just so far and it's going to break and somebody is going to get hurt." Tropiano stated that he had the money to buy the trucks and to furnish the muscle if Caron was not persuaded to stop servicing Milford customers. After the open meeting, Tropiano had a conference in the back room, during which he told Lockwood that it was the latter's duty to obtain the stop from Caron for Tropiano or buy the stop back and give it to C & A or pay C & A directly for the stop. When Caron denied undercutting Grasso's price for the Milford Rivet account, Grasso called Caron a liar. Caron, nevertheless, continued to service this account.

### Post BIRCA Meeting

On April 9th, in order to convince Grasso and Tropiano that Caron was not

undercutting their service price, Mrs. Caron interviewed Robert Reiss, the manager of Milford Rivet Company, and obtained from him a false purchase order of $125.00 a month, which was given to Pellegrino on April 10th. According to Reiss, she appeared so nervous and disturbed at the time that he made an appointment to see the Mayor of Milford. A week later Caron received a call from Pellegrino, who said Caron was "a fool * * * that I have a very nice family and that it would be a shame if something happened to my children on their way to school, or my wife." Caron did nothing about the two accounts but he took his children off the school bus and had his wife drive them to and from school four times a day. At the same time his home was placed under police surveillance, and Mrs. Caron was in such an emotional state that her doctor prescribed tranquilizers.

Not until the following July 4th did Caron hear from any of the appellants. On that day Grasso arrived uninvited at Caron's home during a family picnic. Caron told Grasso that he would not relinquish the two accounts but he agreed not to solicit any more business in Milford and, specifically, not to solicit any of Grasso's customers. Caron planned to build a business in Milford and his agreement to surrender this plan was due to fear for himself and family. Caron did not solicit any of Grasso's customers or any further business in Milford thereafter.

### Contradictory Testimony

The appellants did not take the stand but they did cross-examine the Carons severely. Upon cross-examination Caron admitted certain errors in his direct testimony including the date when he began servicing new accounts in Milford and the number of phone calls he received from Pellegrino and Grasso, and errors, inaccuracies and inconsistencies between his testimony in court and the statements he made to Assistant United States Attorney Heyman and to the Grand Jury. Mrs. Caron also manifested some confusion and inconsistencies upon cross-examination. Furthermore appellants called ed six witnesses who were present at the BIRCA meeting and who contradicted Caron by denying that any threats were made by Grasso or Tropiano at the meeting. There was, however, testimony by the Government witness Lockwood (later declared a hostile witness after attempting to escape from his grand jury testimony) corroborating Caron with respect to Lockwood's meeting with Tropiano in the rear room of the BIRCA meeting place. There was also testimony by Leon Gillick, who was present at the meeting, who testified that he remembered Grasso's statement about bringing trucks from the New Haven area with a few muscle boys, and also Grasso's statement about stretching a rubber band, and by Joseph Pauley, another member present, who remembered a statement being made by someone about stretching a rubber band and also the whole atmosphere of the meeting was "trouble."

### Sufficiency of the Evidence

██ A witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of his testimony. The Carons' errors, inconsistencies and contradictions were elaborately catalogued in the appellants' summation, and the trial court instructed the jury as to the guidelines to be utilized in determining credibility, including its duty to appraise a witness' reaction when faced with contradictions. Nevertheless, the jury believed the Carons upon those issues crucial to the Government's case. It is the province of the jury and not of the court to resolve discrepancies in a witness' testimony which in any way reflect upon his credibility (United States ex rel. Anderson v. Fay, 394 F.2d 109 (2d Cir. 1968)) and to choose between competing inferences of fact. United States v. Marchisio, 344 F.2d 653 (2d Cir. 1965). The Carons' testimony did not stand alone. It was undisputed that there was a meeting of Tropiano, Grasso, Pellegrino, and Caron on March 2, 1968, at Howard John-

son's restaurant, arranged by Pellegrino. Additionally, the Carons' testimony was corroborated by other witnesses on further details establishing the scenario for their story in the following respects: Caron took two "stops" away from C & A; he and his wife went to the Connecticut State Police; he removed his container from Jo-Nick's for two weeks and then returned it; Milford Rivet Company discontinued service with C & A and awarded the business to Caron; Lockwood called a special meeting of BIRCA at the request of Pellegrino and Grasso, although neither Grasso nor Tropiano were members; this meeting was held to consider the problem arising from Caron taking C & A "stops," at which Tropiano, Grasso and Pellegrino were present and at which statements were made about bringing in trucks and "stretching a rubber band"; Bertase called Caron at Grasso's request; Mrs. Caron spoke to Reiss, the manager of Milford Rivet Company, and obtained a false purchase order from him; Caron and Mrs. Caron looked worried and disturbed, and Caron's house was placed under police surveillance.

The jury was free to disbelieve the contradiction by the six BIRCA witnesses, especially in view of the involvement of each in the controversy and Lockwood's effort to retreat from his grand jury testimony. The jury was not required to rely upon words alone but could consider as part of the evidence, the demeanor, bearing, interest and conduct of the witnesses. As aptly phrased by Judge L. Hand: " * * * the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952). Once, however, the verdict of guilty has been returned, the evidence must be viewed "most favorably to the Government, which includes * * * the indulgence in all permissible inferences in its favor." United States v. Brown, 236 F.2d 403, 405 (2d Cir. 1956); United States v.

Castellana, 349 F.2d 264, 267 (2d Cir. 1965), cert. denied, Pagans v. United States, 383 U.S. 928, 86 S.Ct. 934, 15 L. Ed.2d 847 (1966), reh. denied, 384 U.S. 923, 86 S.Ct. 1368, 16 L.Ed.2d 444 (1966); United States v. Marchisio, supra. We find no basis to hold that the Carons' testimony was incredible as a matter of law, or that the evidence was insufficient to support the verdict.

### The Hobbs Act

The application of the Hobbs Act to the present facts of this case has been seriously challenged by the appellants upon the ground that the Government's evidence indicates that no "property" was extorted and that there was no interference or attempted interference with interstate commerce. They assert that nothing more than "the right to do business" in the Milford area was surrendered by Caron and that such a right was not "property" "obtained" by the appellants, as those terms are used in the Act. While they concede that rubbish removal accounts which are purchased and sold are probably property, they argue that the right to solicit business is amorphous and cannot be squared with the Congressional expression in the Act of "obtaining property." The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things (United States v. Provenzano, 334 F.2d 678 (3d Cir. 1964), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); United States v. Nedley, 255 F.2d 350 (3d Cir. 1958)), but includes, in a broad sense, any valuable right considered as a source or element of wealth (Bianchi v. United States, 219 F.2d 182 (8th Cir. 1955), cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955), reh. denied,

349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290 (1955)) and does not depend upon a direct benefit being conferred on the person who obtains the property (United States v. Green, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1956)).

Obviously, Caron had a right to solicit business from anyone in any area without any territorial restrictions by the appellants and only by the exercise of such a right could Caron obtain customers whose accounts were admittedly valuable. Some indication of the value of the right to solicit customers appears from the fact that when the C & A accounts were sold for $53,135, C & A's agreement not to solicit those customers was valued at an additional $15,000. The right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution (Louis K. Ligget Co. v. Baldridge, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928); cf., Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349 (1921); Small v. United States, 333 F.2d 702 (3d Cir. 1964); Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425 (2d Cir. 1962), cert. denied, 371 U.S. 829, 83 S. Ct. 24, 9 L.Ed.2d 66 (1962)). Caron's right to solicit accounts in Milford, Connecticut constituted property within the Hobbs Act definition.

■■ The second challenge to the application of the Hobbs Act is equally without merit. The phraseology of the Act makes it clear that the interference or attempted interference with interstate commerce "in any way or degree" is prohibited. Stated differently, extortion or threats of violence need affect interstate commerce only in a minimal degree to constitute a violation. The broad and extensive reach of the commerce clause under the Hobbs Act has been upheld in a variety of circumstances. United States v. Amabile, 395 F.2d 47 (7th Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969); Battaglia v. United States, 383 F.2d 303 (9th Cir. 1967), cert. denied, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968); Hulahan v. United States, 214 F.2d 441, 445 (8th Cir. 1954); United States v. Malinsky, 19 F.R.D. 426, 428 (S.D.N.Y.1956). Here Caron employed more efficient, modern and costly Dempster front-end loading refuse removal trucks, operated by means of two mechanical arms which lift the rubbish containers up and over the front of the truck and dump them into the rear, providing advantages of cleanliness and security. The trucks required specialized containers for each customer. Both the trucks and containers were manufactured by Dempster Corporation in Knoxville, Tennessee, and were purchased by Caron through Lovard Corporation, Dempster's representative in Syracuse, New York, the trucks being shipped at times f. o. b. shipping point directly from Knoxville. After a large shipment, the receptacles were often stored by Lovard in New Haven, from which Caron would pick up containers as needed. Caron served Jo-Nick's with one container and Milford Rivet Company with another container, which after a time was removed for Milford Rivet's own receptacles. The appellants insist that such evidence is insufficient to support any likely obstruction or effect upon interstate commerce. We cannot agree. Interstate commerce was involved and attempted interference, if not actual interference, was clearly established. Caron's surrender of his right to solicit additional customers in Milford automatically limited his future orders for receptacles for new customers and the trucks required to serve such customers.[2] Sufficient evidence, both circumstantial and otherwise, was present to warrant a finding that the conduct

---

2. Although not mentioned in the Court's charge, the appellants' attempted interference with Caron's relationship with Milford Rivet could be construed as an attempted restraint upon the latter's operational efficiency and consequently an attempted restraint upon interstate commerce, even though in a minimum degree.

of the appellants constituted extortion or attemped extortion which affected interstate commerce within the proscription of the Hobbs Act. United States v. Provenzano, *supra*; United States v. Stirone, 262 F.2d 571 (3d Cir. 1958), reversed on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

### Pretrial Rulings

The trial judge is charged by the appellants with numerous errors in his pretrial rulings including his failure to disqualify himself, error in his denial of the challenge to both the grand and petit jury venires, his failure to grant a change of venue, and his failure to permit an individual *voir dire.*

 The affidavit for disqualification, submitted under 28 U.S.C.A. § 144, alleges "personal bias or prejudice" based upon the factual allegations that the trial judge fixed bonds of $100,000 for Tropiano and $25,000 for Grasso; that he presided at the bail hearing, disclosing the defendants' criminal records, and that prior to the hearing the Chief Assistant United States Attorney was in the judge's chambers. A judge is required to assume the truth of the facts stated in an affidavit for disqualification and to excuse himself when required by those facts. But he is also obligated not to recuse himself when there is an insufficient basis for so doing (Rosen v. Sugarman, 357 F.2d 794, 797 (2d Cir. 1966)), the test being whether the facts alleged give "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." Berger v. United States, 255 U.S. 22, 33–34, 41 S.Ct. 230, 65 L.Ed. 481 (1921); United States v.

Hanrahan, 248 F.Supp. 471 (D.D.C.1965). The mere fact that the trial judge rendered adverse rulings to a party at a bail hearing or has become familiar with a defendant's prior record does not automatically or inferentially raise an issue of bias or disqualify him from presiding at a trial at which the jury is to determine that person's guilt or innocence. Lyons v. United States, 325 F.2d 370 (9th Cir. 1963), cert. denied, 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964); Barry v. Sigler, 373 F.2d 835 (8th Cir. 1967); United States v. Kravitz, 303 F.2d 700 (3d Cir. 1962), cert. denied, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). The mere presence of an Assistant United States Attorney in the judge's chambers, which incidentally in this case was devoted solely to administrative matters, is in the same category.[3] The affidavit was manifestly insufficient.

### The Jury Array

 Appellants contend that the array of grand and petit jurors who indicted and convicted them in both instances, was selected in violation of the Federal juror standards set forth in 28 U.S.C.A. § 1861[4] as they existed prior to the effective date of the 1968 amendment, and also of their constitutional right to due process. The challenge is directed to the selection of the jurors by the so-called "key man suggestor system," stemming from the Connecticut State juror requirements as set forth in § 51–217, Conn.Gen.Stats., and more fully described in United States v. Romano, 191 F.Supp. 772 (D.Conn.1961). Pursuant to this system a letter was sent to a number of citizens from a variety of

---

3. In his brief Grasso states: "we make no claim that, as a result of what occurred at trial, bias or prejudice was demonstrated."

4. At that time Section 1861 read as follows:
 "Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

(2) He is unable to read, write, speak, and understand the English language.

(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

backgrounds, requesting them to suggest to the jury commissioners the names of residents of their communities who they believed would "make qualified jurors for the Federal court" and stating that a prospective juror, "in addition" to the statutory qualifications, "should be esteemed in his community as a person of good character, approved integrity, and sound judgment." [5] The assault is made on both statutory and constitutional grounds and is based upon a claim that this method of selection violates the Federal juror standards contained in the Civil Rights Act of 1957, amending Section 1861, 28 U.S.C.A. The only disqualifications set forth in this section are limited to age, residence, mental or physical infirmities, felony convictions, and literacy.

While portions of the jury list in this case were selected by the key man suggestor system, other portions were selected at random from voter lists, telephone and city directories.[6] Appellants rely heavily upon Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966), which struck down a jury list compiled by jury commissioners who treated the Federal statutory standards as minimum qualifications, to which they added their own ideas as to good character, intelligence and ability to understand, which in turn resulted in an unrepresentative cross-section of the community and the exclusion from the jury panel of a particular class. That case must be limited to its own facts and is no authority against the key man suggestor system, for the same Court, in a case [7] heard en banc with *Rabinowitz* approved the use of a properly chosen key man suggestor system, and in cases before [8] and after [9] *Rabinowitz* the same court upheld the use of such a system. Congress did not in the 1957 amendment establish a uniform system of providing for the selection of a list of qualified jurors from which grand or petit jurors were to be drawn. Beatrice Foods Co. v. United States, 312 F.2d 29, 35 (8th Cir. 1963), cert. denied, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963). The selection process and the choice of specific sources from which names might be drawn were entrusted to the court clerk and jury commissioner. Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 421 (1960).

The 1957 amendment has not been read as prohibiting the adoption of practical and reasonable methods of jury selection which are in no way inconsistent with the

---

5. The phrase "in addition" was inappropriate but the letter explained this by adding: "In determining 'esteem,' please keep in mind that this does not require wide public recognition or high place. Integrity, intelligence, sound judgment, a sense of responsibility—in short, all those qualities of a first-class citizen which cause a man to be esteemed by his fellows—are to be found among the *unheralded just as often as among the prominent* * * * In making up this list, we ask that you make a conscious effort to include both men and women from a variety of backgrounds and occupations so as to give us, *as nearly as possible, a representative cross-section of your community.*" (Emphasis supplied.)

6. For example, a venire of petit jurors was selected from 1,252 persons, 510 of whom were selected in accordance with the key man suggestor system and 742 were chosen at random from voter lists, telephone and city directories.

7. Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966), cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967), reh. denied, 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618 (1967).

8. In Chance v. United States, 322 F.2d 201 (5th Cir. 1963), reh. denied, 331 F.2d 473 (1964), cert. denied, 379 U.S. 823, 85 S.Ct. 47, 13 L.Ed.2d 34 (1964), the same Circuit approved the use of a properly chosen key man suggestor system in two Florida counties where Negro jurors were chosen from citizens recommended by Negro ministers and business leaders.

9. Hunt v. United States, 400 F.2d 306 (5th Cir. 1968), cert. denied, 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969), where the same Circuit upheld a jury suggestor letter in which the clerk added the additional qualification that the prospective jurors be "esteemed" in their respective communities.

Federal standards. Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L. Ed.2d 118 (1961); United States v. Henderson, 298 F.2d 522 (7th Cir. 1962), cert. denied, 369 U.S. 878, 82 S.Ct. 1150, 8 L.Ed.2d 280 (1962). There has been no suggestion that the Connecticut selection procedure was not a random selection or that the selection produced by the system did not represent a fair cross-section of the communnity or that it operated to exclude any special class or group. As in the past, we hold that the test under the 1957 amendment is not whether a particular method of selection, such as voter registration lists, was employed but whether the use of such a procedure resulted in an array which was a representative cross-section of the community or an array from which a cognizable group or class of qualified citizens has been systematically excluded. United States v. Caci, 401 F.2d 664 (2d Cir. 1968), cert. denied, 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 (1969), cert. granted as to other defendants and vacated on other grounds sub nom., Giordano v. United States, 394 U.S. 310, 89 S. Ct. 1164, 22 L.Ed.2d 297 (1969); United States v. Kelly, 349 F.2d 720, 778 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y.1961). The burden was on the appellants to show that the procedure utilized by the partial use of the key man suggestor system did not meet the accepted criteria for Federal jury selection or was inconsistent with the Federal minimums (United States v. Henderson, *supra*; United States v. Ware, 237 F.Supp. 849 (D.D.C.1964), affirmed, 123 U.S.App. D.C. 34, 356 F.2d 787, 790 (1965), cert. denied, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673 (1966)) which burden they have failed to carry. Accordingly, the challenge to the jury array was properly denied.

### Pretrial Publicity

In early February, 1968, a motion was made by Dolores Proto to quash a grand jury subpoena. On February 11th, the following weekend, an inflammatory article appeared in the Connecticut Sunday Herald concerning organized crime and relating to Tropiano's criminal background, associating Grasso with him as his number one cohort. After the indictment was returned on March 27, 1968, the Sunday Herald repeated the inflammatory material and linked Tropiano and Grasso with the Mafia or Cosa Nostra. In a radio interview on March 27, 1968, with the Assistant United States Attorney, questions were raised referring to Tropiano and his rank with the Mafia, with respect to which the Assistant United States Attorney refused to comment. Between the time and the trial on October 23rd, no further inflammatory personal information concerning the activities of the accused appeared in the press.

▆▆▆▆ In May of that year a motion was made by Tropiano and Grasso for a change of venue, which was denied without prejudice and was renewed at the time of the trial in October along with a motion for an individual *voir dire* of the jurors. Both motions were denied and the court then proceeded to question the veniremen *en bloc*. There is no question that the trial court is obligated to provide the defendants with a constitutionally fair trial by affording them protection against the probability of prejudice arising from exposure to inflammatory and prejudicial publicity. Estes v. Texas, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), reh. denied, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965); Sheppard v. Maxwell, 384 U.S. 333, 352–353, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). However, no hard and fast rule of general application can be formulated since the determination of the extent, if any, of the impact of prior adverse publicity depends upon the circumstances of each individual case. But it is well recognized that the passage of time frequently and effectively erodes the impress of the damaging statements upon the minds of the jurors. Beck v. Washington, 369 U.S. 541, 555–558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), reh. denied, 370

U.S. 965, 82 S.Ct. 1575, 8 L.Ed.2d 834 (1962); Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952).

Approximately eight months elapsed between the publication of the pejorative characterizations and the trial in this case. The trial judge asked the prospective jurors on three occasions whether they had heard or read anything about the case and only two remembered anything about newspaper accounts of the events and these accounts related to an innocuous item, printed the Friday before the trial, relating only to the assignment of the case for trial. The appellants contend that this inquiry was too general and that a personalized *voir dire* was necessary to effect a proper inquiry into the impact on the minds of the jury of the inflammatory publicity, citing a number of cases and, in particular, Patriarca v. United States, 402 F.2d 314 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). We find no factual parallels in the cases cited and none of the hazards to a fair trial described by the ABA, Standards Relating to Fair Trial and Free Press (Approved Draft, March, 1968), pp. 25–40. There was no showing that at the date of the trial in October the adverse publicity was fresh in the minds of the community or the jurors or that any remnant of probable prejudice remained from the prior exposure which would require a change of venue. Beck v. Washington, *supra*; United States v. Armone, 363 F.2d 385, 393–396 (2d Cir. 1966), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966); United States v. Battaglia, 394 F.2d 304, 317–318 (7th Cir. 1968). The problem of a personalized *voir dire* rests in the wide discretion of the trial judge (United States v. Bowe, 360 F.2d 1, 12 (2d Cir. 1966), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); United States v. Gillette, 383 F.2d 843, 849 (9th Cir. 1967)) and we believe the trial court in this instance did all that was required and did not abuse its discretion in denying a personalized *voir dire*.

*Evidentiary Rulings*

The appellants urge that they were prejudiced by several evidentiary rulings by the trial court, only two of which deserve consideration: one involving the admission of a false denial by Pellegrino, and the other the admission of evidence of bad reputations of Tropiano and Grasso.

■■■ On January 16, 1968, one of the Government's Special Agents, in the process of investigation, interviewed Pellegrino concerning his knowledge of certain facts relevant to the case. Pellegrino denied to the Agent that he was a member of BIRCA (in fact he was a former president); that he knew Tropiano, Grasso or Caron or anything about the refuse business, or of any problem between Caron and Tropiano and Grasso, or that he ever attended any meeting of BIRCA and in particular the April 7, 1967 meeting—all subsequently established as falsehoods. Tropiano and Grasso argue that Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), precluded the admission of Pellegrino's false exculpatory statements. The trial judge, in the absence of the jury, ruled that *Bruton* was inapplicable and thereafter, in the presence of the jury, permitted the Government to introduce those denials through one of its Special Agents as evidence of Pellegrino's guilty conscience. Prior to the admission of this testimony and again in its charge to the jury, the court was careful to instruct the jury that this testimony must be limited only to the charge against Pellegrino. Tropiano and Grasso argue that no instructions could be sufficient to limit the testimony in the minds of the jury to Pellegrino alone and that the admission denied them the right of confrontation within the scope of *Bruton*. We disagree.

Pellegrino's statement was completely exculpatory as to him and in no way inculpatory as to his co-defendants. As far as Pellegrino was concerned, the denials were offered not as hearsay for

the truth of their contents but as a verbal act by Pellegrino contradicted by evidence subsequently placed before the jury from which a guilty conscience might be inferred. When proven to be false, such an exculpatory statement is "circumstantial evidence of guilty consciousness and [has] independent probative force." United States v. Smolin, 182 F.2d 782, 786 (2d Cir. 1950); United States v. Farina, 218 F.2d 62, 63 (2d Cir. 1954). Not every statement of a co-defendant is barred by *Bruton.* See United States v. Lipowitz, 407 F.2d 597 (3d Cir. 1969). Pellegrino's denials contained no accusation against his co-defendants and were not offered for that purpose (McCormick, Evidence, § 225, pp. 460–461 (2d ed. 1954); cf., Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 190–191 (1948)). Accordingly, a confrontation with Pellegrino was not required by the Sixth Amendment and the appellants have no basis to complain of an unconstitutional admission of evidence.

▋ Referring to the bad reputation evidence, it is a truism that no defendant can be convicted upon his bad reputation or bad character alone. Michelson v. United States, 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948). While bad reputation can never be the sole issue upon which a conviction rests, it may become relevant where one of the elements of the offense is the instillation of fear in the victim since such a reputation frequently conveys a tacit threat of violence. In order to establish a Hobbs Act extortion, the Government was compelled to show that the property was extorted by threatened violence or fear. Thus fear was one of the elements of the offense and bad reputation brought home to Caron by the appellants was relevant together with the other evidence to show that Caron acted out of fear. In fact, he testified that his fear was partially due to the very bad reputations of Tropiano and Grasso, and others testified that he looked worried and frightened. The appellants did not choose to cross-examine Caron upon this issue, although the court in no way limited the scope of the potential cross-examination. Three times the Court cautioned the jury on the limited use of the bad reputation testimony, clearly explaining that the appellants were not to be tried on their bad reputations alone.[10] Likewise, the Court warned that Bertase's and Lockwood's testimony as to bad reputation given under Count 2 (which was subsequently dismissed) was to be considered only under Count 4—the conspiracy charge. Under the carefully limited instructions of the trial court, we find no error in the admission of the bad reputation evidence. Carbo v. United States, 314 F.2d 718 (9th Cir. 1963), cert. denied, Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964), reh. denied, 377 U.S. 1010, 84 S.Ct. 1902, 12 L.Ed.2d 1058 (1964); cf., United States v. Kennedy, 291 F.2d 457 (2d Cir. 1961).

### *Telephonic and Electronic Surveillance*

▋ The Connecticut State Police, as part of their investigation, on two occasions installed a tape recorder upon the Caron telephone. After the conference with Grasso on March 6, 1967, Caron and his wife visited State Police Lieutenant Donald Paige, who initiated an investigation of the alleged threats. As previously mentioned, the Carons testified that in March, 1967 they received many phone calls from Grasso and Pellegrino, in one of which Pellegrino told Mrs. Caron that her husband was playing with a "rough bunch of guys" and that she should have him "lay off before he got hurt." A tape recorder was installed in the Caron home on March 22, 1967 and remained there for two days, during which time Caron received one call from Grasso,

10. In fact, in his brief Tropiano concedes that "the Court did go to unusual lengths to shield the defendants against unfairness in this sector of the proofs."

which was recorded, and another one from Robert Reiss, manager of the Milford Rivet Company. Both of these recordings were introduced into evidence by the appellants. This recorder was removed on March 24th but, at the request of Mrs. Caron, it was reinstalled in her home on April 3rd and remained there until April 16th. During this period there were recorded on the tape, conversations between Caron and several members of BIRCA, referring to the various problems arising from Caron's business. The only portion of this recording which was made part of the record, was the portion of the conversation between Peter Bertase and Leonard Caron, a copy of which was given to the appellants' counsel before cross-examination. There was another tape recording of a conversation between Caron and Pellegrino which took place in Caron's house, which was unintelligible. With the exception of the Bertase conversation with Caron, the Government did not use any of the tapes at the trial and complied with its duty of full disclosure to counsel for appellants.

Appellants argue that the telephonic tape recordings invaded their Fourth Amendment right, citing Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), reh. denied, 386 U.S. 938, 87 S.Ct. 951, 17 L.Ed.2d 813 (1967), and United States v. White, 405 F.2d 838 (7th Cir. 1969), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969). Osborn has no application to this case and this Court in United States v. Kaufer, 406 F.2d 550 (2d Cir. 1969), affirmed, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), reh. denied, 395 U.S. 917, 89 S.Ct. 1741, 23 L.Ed.2d 232 (1969), has refused to follow White, holding that the admission into evidence of consensual tape recording is constitutionally permissible. See Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), reh. denied, 355 U.S. 925, 78 S.Ct. 363, 2 L.Ed.2d 355 (1958).

On another occasion, on April 7th, Caron took with him to the BIRCA meeting a portable one-way radio transmitter equipped with an antenna in his sleeve, which was given to him by State Trooper David Paige for his protection. In spite of the fact that it was tested and found working early in the day at a range of 150 feet, Trooper Paige could not hear anything significant although he was only twenty feet away. The police testified that they heard nothing but static, which they suggested was due to the cinder block construction of the building, the malfunction of the transmitter, or the inclement weather. It is the appellants' position that the electronic surveillance of this meeting was likewise a violation of their Fourth Amendment rights. While the Fourth Amendment protects people rather than places (Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), it does not prohibit the transmission of a conversation of a defendant who knowingly exposes his statements to the public. Thus in this case the BIRCA meeting was open to all the members and Tropiano and Grasso had no justifiable expectation of privacy at this meeting which they could claim was constitutionally invaded in violation of the Fourth Amendment. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), reh. denied, 386 U.S. 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), reh. denied, 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963).

The other objections to the surveillance were of a minor nature, which we find to be completely irrelevant.

### Other Claims of Error

Among the many other claims of error, only a few merit consideration. Appellants assail the constitutionality of the Hobbs Act, the indictment, and the Court's charge. They assert that the Hobbs Act requires proof of completed extortion and if construed to cover attempted extortion, is constitutionally void for vagueness. The premise for this claim is that the phrase

"attempts or conspires so to do," as used in the Act, refers to interference with commerce and not to the word "extortion." One answer to this contention is that Caron's agreement not to solicit business in the Milford area was, in fact, evidence of completed extortion under the substantive Count 1. As to the conspiracy Count 4, the textual analysis of the statute would clearly embrace an attempt or conspiracy to interfere with commerce by extortion even though the attempt or conspiracy failed because the extortion was uncompleted. United States v. Pranno, 385 F.2d 387, 389–390 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968). Tropiano and Grasso also urge for the first time on appeal that Count 4 of the indictment was invalid because it charges a conspiracy to attempt to extort. The wording of Count 4 accuses the appellants of a conspiracy to violate the Act "by extortion and attempted extortion." The phrase "attempted extortion" is obviously surplusage, which the appellants failed to show in any way misled them. Cf., United States v. Di Pietroantonio, 289 F.2d 122, 124 (2d Cir. 1961). Since the sentences on Counts 1 and 4 were concurrent, appellants can hardly claim prejudicial error. Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), reh. denied, 355 U.S. 967, 78 S.Ct. 529, 2 L.Ed.2d 542 (1958); United States v. Kennedy, supra.

The Court charged the jury that fear in Hobbs Act cases includes fear not only of violence but also of economic loss. Appellants assert that the inclusion of "economic loss" in the charge was erroneous because it indicates that the mere threat of undercutting prices by competition constitutes Hobbs Act extortion, which of course it does not. The charge, they claim, should have explained, among other things, that such threats were excluded from the ambit of the Act. It is too late in the day to contend that fear of economic loss is excluded from the Hobbs Act (Bianchi v. United States, supra; Nick v. United States, 122 F.2d 660, 138 A.L.R. 791 (8th Cir. 1941), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941), reh. denied, 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570 (1941)) and whatever theoretical merit there may be in appellants' contention as to competition such an explanation was unnecessary upon the record of this case.

Finally, Pellegrino objects to the trial court's aider and abettor instructions, asserting that since he was not named in the indictment as an aider and abettor the charge was unnecessary and erroneous in that it was unclear as to its application to the substantive count or to the conspiracy count, and failed to explain that a conviction as an aider and abettor was impossible without prior proof of the commission of the crime by a principal. A defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor (United States v. Provenzano, supra; United States v. Washington, 287 F.2d 819 (7th Cir. 1961), cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961); Nassif v. United States, 370 F.2d 147 (8th Cir. 1966); Glass v. United States, 328 F.2d 754 (7th Cir. 1964), cert. denied, 377 U.S. 983, 84 S. Ct. 1892, 12 L.Ed.2d 751 (1964)), and it is unnecessary that the principal be first convicted or even identified. Gray v. United States, 104 U.S.App.D.C. 153, 260 F.2d 483 (1958). Conspiracy to commit a substantive offense and aiding and abetting the commission of the same offense constitute separate and distinct crimes and a defendant may be convicted of both. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Kensil, 195 F.Supp. 115 (E.D.Pa.1961), affirmed, 295 F.2d 489 (3d Cir.1961), cert. denied, Haith v. United States, 368 U.S. 967, 82 S.Ct. 439, 7 L.Ed.2d 396 (1962). In its charge the trial court read to the jury the aiding and abetting statute and explained it in clear and unambiguous language. We find no fac-

tual similarity to United States v. Garguilo, 310 F.2d 249 (2d Cir. 1962), cited by Pellegrino, nor any error in the Court's charge upon this point or in any other respect. The other claims being similarly without merit, are hereby rejected.

Affirmed.