**UNITED STATES of America, Plaintiff,**

v.

**Arthur COFFEY, Harold Daggett, Albert Cernadas and Lawrence Ricci, Defendants.**

**No. 04–CR–651(ILG).**

United States District Court, E.D. New York.

March 29, 2005.

Roslynn A. Mauskopf, Taryn A. Merkl, Paul Weinstein, United States Attorney, Brooklyn, NY, for plaintiff U.S.

Jack Arsenault, Arsenault, Fassett and Mariano, Chatham, NJ, for defendant Albert Cernades.

Ernest H. Hammer, New York City, for defendant Arthur Coffey.

George Daggett, Daggett, Kraemer, Eliades, Vanderwiele & Ursin, Sparta, NJ, for defendant Harold Daggett.

Jeffrey Garrigan, Jersey City, NJ, for defendant Lawrence Ricci.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### INTRODUCTION

The grand jury returned a two count superseding indictment (the "indictment") against defendants Arthur Coffey ("Coffey"), Harold Daggett ("Daggett") and Albert Cernadas ("Cernadas") (collectively, "defendants"). Before the Court are various pretrial motions by defendants.[1] Coffey and Daggett seek to join all motions made by codefendants to the extent that such motions are not inconsistent with their own.[2] Therefore, to that extent, the Court will rule on the pending motions as if they were filed by all defendants.

The indictment arises out of the activities of the Genovese organized crime family, and specifically, defendants' (and the larger Genovese family's) control over the International Longshoremen's Association ("ILA") and several of its local unions and welfare benefit plans. The Government alleges that Coffey, Daggett and Cernadas were associates of the Genovese family, each belonging to "crews" that historically were located in Harlem and the Bronx, the Greenwich Village area of Manhattan, and northern New Jersey. (Indictment ¶¶ 5, 6). Defendants allegedly used their influence as associates of the Genovese family to, among other things, secure lucrative financial and powerful union positions within the ILA and its locals, thereby ensuring that the Genovese family could exercise a virtual stranglehold over the containerized shipping business in the ports of New York City, New Jersey and Miami, Florida. (Id. ¶¶ 7–10). Through their leadership positions within the ILA and in various welfare benefit plans, including the METRO–ILA Fund, the Local 1922–1 Fund, and the Southeast Ports Fund (collectively, the "Funds"),[3] defendants en-

---

1. Since the filing of these motions, the Government filed a superseding indictment that was unsealed in February, 2005 naming Lawrence Ricci as an additional defendant.

2. The Government does not take a position on this issue. (Gov't Mem. at 3 & n. 2).

3. At various times, defendants were allegedly trustees of the Management–International Longshoremen's Association Managed Health Care Trust Fund ("MILA Fund"); Daggett was trustee of the METRO–ILA Welfare Fund ("METRO–ILA Fund"), president of ILA Local 1804–1, secretary-treasurer of the Atlantic Coast District of the ILA and assistant general organizer for the ILA International; Coffey was a trustee of the ILA's–Local 1922–1/2062 Health and Welfare Fund ("Local 1922–1 Fund"), and president of ILA locals 1922, 1922–1 and 2062, ILA International vice-president and executive board member of the South Atlantic and Gulf Coast Region of the ILA; and Cernadas was president of ILA Local 1235, and executive vice president of the ILA International. (Indictment ¶ 8).

riched themselves and the extended Genovese family network by controlling the grant of service contracts entered into by the Funds, to the detriment of the Funds and the rank and file membership of the ILA and its locals. (*Id.* ¶¶ 8–10).

In addition, the indictment alleges, *inter alia,* that defendants championed changing the service provider for the prescription pharmaceutical benefit program for the MILA and METRO–ILA funds to GPP/VIP, Inc. ("GPP/VIP"), because this entity was associated with organized crime. (Indictment ¶ 16). Defendants did not disclose this relationship in their dealings with the MILA and METRO–ILA Fund. (*Id.*) Defendants also "secretly agreed" that the contract for mental health care services offered to plan members receiving benefits from the MILA, METRO–ILA, Local 1922–1 and Southeast Port Funds should be awarded to Compsych "because that company paid an associate of organized crime." (*Id.* ¶ 15).

Against this background, count one of the indictment charges Coffey and Daggett with extortion conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951(a). Count two of the indictment charges defendants with mail and wire fraud conspiracy in violation of 18 U.S.C. §§ 1341, 1343, 1346.

The pre-trial motions which defendants filed are as follows: (a) motion to dismiss count one of the indictment because it refers to intangible rights and is duplicitous; (b) motion to dismiss count two of the indictment because it does not allege a viable claim and because 18 U.S.C. § 1346 is void for vagueness; (c) motion to sever claims; (d) motion to require the Government to file a bill of particulars; (e) motion to strike surplusage from the indictment; (f) motion to grant a pre-trial hearing to determine the admissibility of co-conspirator statements; (g) motion to require the Government to provide a witness list 30 days before trial; and (h) motion to change case designation as related to *United States v. Gotti* and not *United States v. Bellomo* and to allow defendants access to grand jury minutes.

For the reasons set forth below, defendants' motions are denied.

## DISCUSSION

### I. Motion To Dismiss Count One of the Indictment

Daggett and Coffey move to dismiss count one of the indictment for extortion conspiracy under the Hobbs Act to the extent that it refers to intangible rights and because they contend that it is duplicitous. Each argument is discussed in turn.

### A. Intangible Rights Under the Hobbs Act

Daggett and Coffey move to dismiss count one of the indictment to the extent that it alleges that they and their co-conspirators agreed "to obtain property, to wit: money and the right to pursue lawful business, from owners, officers, employees and agents of businesses operating at the piers in the New York City metropolitan area, northern New Jersey and Miami, Florida." (Indictment ¶ 12; Daggett Mem. at 6). The Hobbs Act provides that "[w]hoever in any way or degree obstructs ... or affects commerce ... by ... extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). "Extortion means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2); *see gener-*

ally *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence").

Defendants contend that under the United States Supreme Court's decision in *Scheidler v. National Organization of Women*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003), they were unable to "obtain" "the right to pursue [the] lawful business" of others and thus did not commit "extortion" as that phrase is defined in 18 U.S.C. § 1951(b)(2).[4] (*Id.*) Although they do not cite it, defendants presumably seek to rely on *United States v. Bellomo*, 263 F.Supp.2d 561, 574–76 (E.D.N.Y.2003) (Glasser, J.), in which I granted a motion to dismiss Hobbs Act counts to the extent they were based on the extortion of union members' rights to nominate and elect union officers under 29 U.S.C. §§ 411 and 501 of the Labor Management Reporting and Disclosure Act ("LMRDA"). In analyzing the impact of *Scheidler*, I held that since Title 29 prohibited voting by proxy, a union member's rights under the LMRDA could not be "exercised, transferred or sold" by the defendants and therefore

were not "obtainable" under *Scheidler*.[5] *Id.*

■ I am now asked to revisit this issue though with a different property right before me. As was the case in *Bellomo*, however, the fundamental question that I must answer is the same. The issue is not whether the "right to pursue lawful business" is property, but whether it is "property that is obtainable." *Bellomo*, 263 F.Supp.2d at 575. In *Bellomo*, I found persuasive the fact that the property right at issue—the union member's ability to nominate and elect his officers—could not, as a matter of law, be exercised, transferred or sold. *Id.* at 575–76 (citing 29 U.S.C. §§ 402(k), 481(b)). In this case, by contrast, the "property" at issue is the right to pursue lawful business. As alleged in the indictment, Daggett and Coffey conspired to use "actual and threatened force, violence and fear" to usurp business opportunities for the Genovese family (with which both Daggett and Coffey are alleged to be associated) that otherwise would have been acquired by third parties who would be free from the influence of the Genovese family. (Indictment ¶ 12).

Accordingly, in *Bellomo*, my decision rested firmly on the conclusion that the

4. In *Scheidler*, the Supreme Court held that, among other things, the right of a class of women to obtain medical services from clinics which performed abortions constituted "property" under the Hobbs Act, but in depriving the class of this right, the abortion opponents "neither pursued nor received something of value from respondents that they could exercise, transfer or sell." *Scheidler*, 537 U.S. at 405, 123 S.Ct. 1057 (citation and internal quotation omitted). "To conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." *Id.*

5. In *Bellomo*, noting that "reasonable minds might conclude that the issue is not entirely free from doubt," I "encouraged" the Government "to exercise its right to appeal [my] determination as it [was entitled to do] in accordance with 18 U.S.C. § 3731," but it did not. *Bellomo*, 263 F.Supp.2d at 576. Since issuing my memorandum and order in *Bellomo*, at least three other courts in this Circuit to have addressed the same issue reached the opposite conclusion. *See, e.g., United States v. Cacace*, 2004 WL 1646760, at *3 (E.D.N.Y. July 14, 2004); *United States v. Peter Gotti*, 02 Cr. 606 (Tr. of Sentencing Hearing, Mar. 26, 2004, at 10–18); *United States v. Muscarella*, 2004 WL 2186561, at *3–7 (S.D.N.Y. Sept. 28, 2004).

property interest at issue there, by law, could not be transferred. In contrast, defendants' counsel has not referred to any authority for the proposition that the "right to pursue lawful business" cannot be exercised, transferred or sold. Particularly apposite to this case is the Second Circuit's decision in *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir.1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970).[6] In *Tropiano*, the defendants were partners in a sanitation removal company known as C & A. When Caron Refuse Removal, Inc. replaced C & A in servicing some of C & A's customers, the defendants by threats of violence forced Caron Refuse to cease further attempts to acquire C & A's customers and to consent not to solicit any more business in that area. The Second Circuit held that the property extorted was the right of Caron Refuse to solicit business free of territorial restrictions wrongfully imposed by its competitors. 418 F.2d at 1076. This holding is directly relevant here: the loss of the right to solicit accounts and bid for contracts constitutes the requisite economic loss under the Hobbs Act, which "includes, in a broad sense, any valuable right considered as a source or element of wealth.... The right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution." *Id.* (citations omitted). The Court thus agrees with the Government that here, as in *Tropiano*, the property extorted was the "right to pursue lawful business."[7]

The fact that neither Daggett nor Coffey may have personally benefitted from the charged conduct under the Hobbs Act—but that the conduct inured to the benefit of the Genovese family—has no legal significance. *See, e.g., United States v. Green*, 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956) ("extortion as defined in the statute in no way depends upon having a direct benefit conferred on the person who obtains the property"); *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 101–02 (2d Cir.1990) (same) (citing and quoting *United States v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir.1981), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981)). Daggett's and Coffey's motion to dismiss count one of the indictment is, therefore, denied.

**B. Duplicity**

Daggett, and by extension Coffey, argue that count one of the indictment should be dismissed as duplicitous because it charges two conspiracies and therefore two crimes. (Daggett Mem. at 6–7) (citing *United States v. Murray*, 618 F.2d 892 (2d Cir.1980)). The rule against duplicity prohibits the Government from joining two or more distinct offenses in a single count, because if a jury were to return a general verdict on a duplicitous count, it would be unclear as to whether the defendant was found guilty of only one crime and not the other, or guilty of both. *Murray*, 618 F.2d at 896. The test to be applied to determine whether there are two offenses or only one offense charged is "whether each provision in the count requires proof of a fact which the other does not." *Blockbur-*

---

**6.** In *Scheidler*, the Court rejected the suggestion that decisions such as *Tropiano*, 418 F.2d 1069, had been overruled. 537 U.S. at 402 n. 6, 123 S.Ct. 1057.

**7.** For purposes of defendants' motions, the Court cannot examine the Government's

proof prior to trial, but must accept the allegations in the indictment as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

ger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

A single count that alleges more than one offense, however, is not necessarily subject to dismissal as duplicitous. Indeed, under the well settled law of this Circuit, " 'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.' " *United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting *United States v. Tutino,* 883 F.2d 1125, 1141 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990)). Moreover, the rule does not prohibit the Government from alleging two or more means of committing the same crime in a single count, which the case Daggett himself cites recognizes. *Murray,* 618 F.2d at 899 & n. 7 (allegation in a single count of commission of a crime by several means is not duplicitous).

Here, the Government has alleged that Coffey and Daggett conspired to obstruct commerce by extortion to obtain the following: (a) "money and the right to pursue lawful business" from businesses operating at the ports in New York, New Jersey and Miami, and (b) ILA labor union positions and money. (Indictment ¶ 12). Therefore, on its face, the indictment charges Coffey and Daggett with one crime, conspiracy, under the Hobbs Act. A charge of conspiracy to commit several crimes in one count is not duplicitous because the crime is conspiracy which is one crime regardless of the diversity of its objects. *Frohwerk v. United States,* 249

U.S. 204, 210, 39 S.Ct. 249, 63 L.Ed. 561 (1919).

It also deserves mention that a count of an indictment should be dismissed because it is duplicitous only when the policy goals underlying the doctrine are compromised, for example, "if a general verdict of guilty might actually conceal contrary findings as to different alleged crimes." *United States v. Margiotta,* 646 F.2d 729, 732–33 (2d Cir.1981). The Court finds that the characteristics typically present when courts dismiss a count in the indictment because it is duplicitous are not present here. *See generally United States v. Weissman,* 1996 WL 742844, at *25 (S.D.N.Y. Dec. 20, 1996).[8] First, count one of the indictment adequately notifies Daggett and Coffey of the charge against which they must defend. Specifically, count one of the indictment sets forth a distinct period within which Daggett and Coffey allegedly conspired to commit the two acts charged as extortion. Second, neither Daggett nor Coffey argues that he would be subject to prejudicial evidentiary rulings because of how the indictment is framed. Third, the indictment specifically describes Daggett's and Coffey's conduct which is the subject of the prosecution and provides them with adequate protection against further prosecutions of the same charge. Finally, the Court, through its jury instructions, will ensure that Daggett and Coffey will receive a unanimous verdict on the charge. *See United States v. Albunio,* 1992 WL 281037 at *1, 4 (E.D.N.Y. Sept. 9, 1992) (holding that a single count charging "multiple acts of ex-

---

**8.** The four purposes served by the prohibition against a duplicitous indictment are as follows: (1) it provides defendants with adequate notice of the nature of the charges against them so that they may prepare their defense to such charges; (2) it reduces the risk that defendants will be subjected to prejudicial evidentiary rulings; (3) it tends to produce trial records which allow defendants to plead prior convictions or acquittals as a bar to subsequent prosecutions of the same conduct; and (4) it does not present the risk that the jury may convict defendants by a less than unanimous vote. *Weissman,* 1996 WL 742844, at * 25.

tortion at various (unspecified) locations at various (unspecified) times over a three year period from various (unspecified) 'victims'" was not duplicitous in that it charged a single, continuous scheme of extortion). Accordingly, defendant Daggett's and Coffey's motion to dismiss count one of the indictment on the ground of duplicity is denied.

## II. Motion to Dismiss Count Two of the Indictment

 Cernadas argues that the Court should dismiss count two of the indictment for mail and wire fraud conspiracy because it fails to plead the essential elements of the crime charged, namely either a loss of money or property or a scheme to deprive third parties of honest services. (Cernadas Mem. at 7–19). The standard governing a motion to dismiss is well settled—the Court must treat the allegations in the indictment as true. *See, e.g., United States v. Velastegui*, 199 F.3d 590, 592 n. 2 (2d Cir.1999), *cert. denied*, 531 U.S. 823, 121 S.Ct. 67, 148 L.Ed.2d 32 (2000). The indictment is governed by Fed.R.Crim.P. 7(c), which requires only that it contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Therefore, to be legally sufficient, the indictment must specify the elements of the offense in sufficient detail to allow defendants to have notice of the charges against them and to permit them to plead double jeopardy in a future prosecution based on the same events. *See, e.g., United States v. Walsh*, 194 F.3d 37, 44 (2d Cir.1999). The Second Circuit has held that the indictment is legally sufficient if it tracks the statutory language of the offense charged, states the approximate time and place of the alleged crime, and contains some amount of factual particularity to ensure that the prosecution will not fill in the elements of its case with facts other than those considered by the grand jury. *See id.*

 Generally, the indictment does not have to specify evidence or details of how the offense was committed. *See, e.g., United States v. Carrier*, 672 F.2d 300, 303–04 (2d Cir.1982), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

### A. Failure to Plead That Defendants' Conduct Resulted in a Loss of Money or Property, and Actual or Intended Harm

 Defendants contend that count two of the indictment should be dismissed because it fails to allege a loss of money or property. Defendants also argue that the fraud count is deficient as a matter of law because it fails to plead that defendants caused harm, or intended to cause harm, to the Funds, the object of the purportedly fraudulent scheme. (Cernadas Mem. at 7–14; Reply Mem. at 1–4). Count Two of the indictment alleges that defendants defrauded the Funds and their beneficiaries of the defendants' "honest services," "money and property" by awarding two contracts to two companies (Compsych and GPP/VIP) affiliated with the Genovese family and by concealing that relationship from the Funds.

The crux of mail fraud and wire fraud is an intent to defraud. In relevant part, 18 U.S.C. § 1341, the mail fraud statute, states: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for

mail matter, any matter or thing whatever to be sent or delivered by the Postal Service" shall be guilty of a crime. Similarly, 18 U.S.C. § 1343, the wire fraud statute, states: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... transmits or causes to be transmitted by means of wire ... any writings ... or sounds for the purpose of executing such scheme or artifice," shall be guilty of a crime.[9] Therefore, the "essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.2004).

As a threshold matter, therefore, the Court notes that the statutory language of the mail and wire fraud statutes require a scheme "or artifice" to defraud directed at a property right. Moreover, the party who is the target of the fraud must be the same party whose property may be lost if the scheme is successful. The United States Supreme Court in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), provided important guidance as to what constitutes "property" for purposes of the mail and wire fraud statutes. The defendant in *Carpenter* was convicted of wire fraud for divulging confidential information belonging to his employer, the Wall Street Journal, in advance of scheduled publication dates. 484 U.S. at 23, 108 S.Ct. 316. *Carpenter* held that, besides being deprived of

its intangible right to "honest and faithful service," which *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987),[10] had held "too ethereal" an interest to come within the mail fraud statute, the Journal had been deprived of "something of value." *Id.* at 25, 27, 108 S.Ct. 316. The Court found that notwithstanding its "intangible nature," confidential business information traditionally has been treated under state law as a "species of [intangible] property to which the corporation has the exclusive right and benefit." *Id.* at 26, 108 S.Ct. 316. Although the Journal may have sustained no demonstrated monetary loss from the premature disclosures, the Court decided that the newspaper had "been deprived of its right to exclusive use of the information," an "important aspect" of most · property rights. *Id.* at 26–27. In *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), the Court imposed some limitation on the type of non-economic property interest sufficient to allege an offense under the mail and wire fraud statutes. *Id.* at 20, 108 S.Ct. 316 (holding that a state's unissued video poker license did not constitute property under the mail and wire fraud statutes). Essential to the Court's holding was the fact that the license in *Cleveland* was never capable of being property in the hands of the victim, which as discussed below, is not the case here. As such, *Cleveland* did not substantially limit the breadth of the holding in *Carpenter* as defendants appear to argue. (Cernadas Mem. at 9–10).

9. In *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir.1991), the Court of Appeals held that "[b]ecause the mail fraud and wire fraud statutes use the same relevant language, we analyze them the same way." (citation omitted).

10.. Congress overruled the holding in *McNally* when it enacted 18 U.S.C. § 1346 ("the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services"). This statute is discussed below and forms another basis for defendants' motion to dismiss count two of the indictment.

Defendants assert that notwithstanding the holding in *Carpenter*, and because of *Cleveland*, the property interest alleged in the indictment—the Fund's right to know that service contracts were awarded to companies associated with the Genovese family—is not reached by the statute. In support of their argument, defendants rely on *United States v. Evans*, 844 F.2d 36 (2d Cir.1988), in which various individuals were charged with mail and wire fraud resulting from the sale of arms from foreign countries to Iran and, in furtherance of that scheme, to deceive the United States about the true destination of the arms. The district court dismissed the mail and wire fraud counts of the indictment. Two issues were raised by the government on appeal. First, whether to establish a violation of the mail and wire fraud statutes, the government "must show that the goal of the fraudulent scheme was to deprive the party deceived (rather than someone else) of money or property"; and second, "whether the right of the United States to veto sales of U.S.-made or licensed weapons by one foreign government to another is a property right for wire and mail fraud purposes." *Evans*, 844 F.2d at 36. In affirming the district court's dismissal of the mail and wire fraud counts of the indictment, the Second Circuit held "we agree with the district court that the government must prove that the scheme aimed at depriving it of money or property, and that the right to control future arms sales is not a property right for this purpose." *Id*. In light of the unique facts giving rise to *Evans*, the Court concludes that it sheds no light on the issue which defendants present here. *See also United States v. Pierce*, 224 F.3d 158, 166 (2d Cir.2000) (reasoning that if there is no property right "with which the defendant might interfere, we do not think that the defendant's plan to make misleading statements to the [intended victim]

would have constituted a scheme to defraud").

A case which does address the issue presented here is *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) (hereinafter "*Regent*"), in which the Second Circuit reversed the defendants' conviction for violating the mail fraud statute. The defendant corporation, through salespeople, sold stationery products directly to customers by telephone. *Regent*, 421 F.2d at 1176. Concerned about threatened prosecution due to the false representations which the salespeople admitted making to customers about, among other things, how they obtained referrals to the customers (but not about the goods that were sold), the defendants agreed to subject themselves to criminal prosecution, "a procedure which they hoped would obtain for them (and the 'sales pitch') the blessing of the courts." *Id*. After a nonjury trial conducted in large part by stipulation, the district court found the defendants guilty on all counts. *Id*. at 1177. On appeal, the issue before the Second Circuit was whether mail fraud is alleged where it does not concern the essence of the bargain, in that case, the "quality, adequacy or price of the goods to be sold." *Id*. at 1179.

The Second Circuit in *Regent* reversed and held that the indictment did not charge mail or wire fraud because "the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful." *Regent*, 421 F.2d at 1182. Determinative of the holding was the fact that the fraud did not relate in any way to the quality or price of the stationery sold to the customer. *Id*. at 1180–83. Rather, the fraud took place prior to the salesperson's discussion with the

customer about the nature of the goods sought to be sold. *Id.*

Significantly, the Second Circuit recognized that its holding was limited, in that it was only determining whether "fraud may exist in a commercial transaction even when the customer gets exactly what he expected and at the price he expected to pay." *Regent,* 421 F.2d at 1179–80 ("But this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion"). The Court concluded "that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's *understanding of the bargain* nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception." *Id.* at 1182 (emphasis added).

In so holding, the Court implicitly recognized that a fraud claim could be properly charged where the false statements, or omissions, impacted the "customer's understanding of the bargain" or "influenced his assessment of the value of the bargain." *Regent,* 421 F.2d at 1182; *see also United States v. Schwartz,* 924 F.2d 410, 420 (2d Cir.1991) ("the deceit practiced must be *related to the contemplated harm,* and that harm must be found to reside in the bargain sought to be struck," and therefore the mail and wire fraud statutes are not violated if "the defendants' false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably anticipated and actual benefits received"); *·United States v. Welch,* 327 F.3d 1081, 1108 (10th Cir.2003) ("That the indictment alleges Defendants had an intent to deprive the SLBC of 'the right of honest services' is sufficient to satisfy the intent element"). This is precisely what the Government alleges in the indictment here—that the

Funds were defrauded when the defendants failed to disclose their connections to the Genovese family which resulted in the Funds unknowingly entering into contracts with two entities that were affiliated with that family. (Indictment ¶¶ 15, 16). In other words, the Funds' "understanding of the bargain" was obtained through fraud.

Defendants also argue that the indictment should be dismissed because it does not allege that their conduct resulted in harm or that they intended harm to be done. Defendants assert that the Second Circuit's decision in *United States v. Mittelstaedt,* 31 F.3d 1208 (2d Cir.1994), *cert. denied,* 513 U.S. 1084, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995), "is on all fours." (Cernadas Reply Mem. at 1–3). In *Mittelstaedt,* the defendant, John Johnsen, served as an engineer to two municipalities, and persuaded the municipalities to purchase properties from a business in which Johnsen and Mittelstaedt were partners. 31 F.3d at 1211–12. While *Mittelstaedt* rejected the government's position that the "loss of the 'right to control' the expenditure of public funds" could serve as the basis of the "property" underlying a conviction of the federal fraud statutes, its holding was predicated on the Supreme Court's holding in *McNally,* 483 U.S. at 356, 107 S.Ct. 2875, which narrowed the definition of "property" for purposes of the mail and wire fraud statutes. However, the holding in *McNally* was superceded by the enactment of 18 U.S.C. § 1346 one year later in 1988, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *See Mittelstaedt,* 31 F.3d at 1218 ("Johnsen's conduct ... predates the November 18, 1988 amendment, and so is measured by the 'money or property' requirement of *McNally* "); *see id.* ("Mittelstaedt argues ... that all conduct ... pre-dated the addition of § 1346 ... and

that those transactions could not have provided the basis for a conspiracy conviction because they do not satisfy the 'money or property' requirement of *McNally* ").

Regarding the pleading burden with respect to harm, or intent to harm, the government need not prove "that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim." *Schwartz*, 924 F.2d at 420; *United States v. King*, 860 F.2d 54, 55 (2d Cir.1988) ("as we have said many times, the validity of a mail fraud conviction does not hinge upon a showing of actual loss by the intended victim. . . . It is enough that appellant knowingly devised a scheme to defraud and caused the use of the mails in furtherance of the scheme") (citations omitted), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

██ With respect to intent, the Second Circuit has consistently held that to establish an intent to defraud, the plaintiffs must adequately allege that the "defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996). In other words, "the purpose of the scheme must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out." *Regent*, 421 F.2d at 1181. The language in the indictment satisfies this standard, as it alleges that defendants concealed their relationship to the Genovese family from the

Funds for the purpose of receiving union positions they otherwise may not have received and deprived the Funds of honest service providers untainted by a mafia connection.[11]

Against this background, accepting as true the Government's factual allegations in the indictment as it must do, the Court finds that the indictment tracks the express language of the statutes and unambiguously states the elements that constitute the offenses charged. Therefore, defendants' motion to dismiss count two of the indictment to the extent it is directed at 18 U.S.C. § 1341 and 18 U.S.C. § 1343 is denied.

**B. Honest Services as Property**

██ Pursuant to 18 U.S.C. § 1346, defendants argue that count two of the indictment should be dismissed because it does not allege an actual or potential detriment to the Funds under the "honest services" theory. However, as discussed above, in 1988, Congress amended the mail fraud statute to narrow, if not overrule, *McNally* and make it clear that intangible rights are protected by the prohibitions against mail and wire fraud. *See* 18 U.S.C. § 1346, *supra*.

In a sharply divided *en banc* decision, the Second Circuit in *United States v. Rybicki*, 354 F.3d 124 (2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 32, 160 L.Ed.2d 10 (2004), upheld the statutory language covering "the intangible right of honest services."[12] In *Rybicki*, the defendants were indicted and subsequently convicted of mail and wire fraud and a con-

---

**11.** The Court notes that the statutory language of the mail and wire fraud statutes does not require the Government to allege that defendants intended harm or actually caused harm as a result of their conduct charged under either 18 U.S.C. § 1341 or 18 U.S.C. § 1343. This is consistent with the Second Circuit's recitation of the essential elements for these offenses. *See infra*.

**12.** The dissent contended that the vagueness of the statute was of constitutional dimensions. However, this view was rejected by the majority and therefore, to the extent that defendants challenge the constitutionality of 18 U.S.C. § 1346 on its face, this motion is denied based on the Second Circuit's holding in *Rybicki* which I am bound to follow.

spiracy to commit mail fraud. Defendants, two lawyers and the law firm of which they were members, made secret payments to insurance adjusters to expedite settlements. 354 F.3d at 127. The insurance companies maintained a written policy that proscribed the adjusters from accepting any fees. *Id.* The payments were accepted but not reported to their employers. *Id.* Defendants "took considerable steps to disguise and conceal the payments." *Id.* The government did not seek to prove that any settlement amount had been inflated. *Id.* On appeal, the issue before the *en banc* panel was whether section 1346's "expansion of the definition of 'scheme or artifice to defraud' to include a scheme or artifice to deprive another of 'the intangible right of honest services' is unconstitutionally vague." *Id.* at 128.

The majority opinion in *Rybicki* did not adopt the view of the dissenters that 18 U.S.C. § 1346 was unconstitutionally vague because it reasoned that the jurisprudence of "honest services" rejected by *McNally* was revived by the enactment of section 1346. *Rybicki,* 354 F.3d at 134–36 ("The sparse legislative history of section 1346 makes clear, if little else, that the statutory provision was designed to 'overrule' *McNally* at least in part, *i.e.,* to place within the statutory proscription certain frauds that *McNally* had held were not covered by the mail-and wire-fraud statutes") (citations omitted). The majority in *Rybicki* outlined the contours of 18 U.S.C. § 1346, which, they concluded, had limitations, and thus quelled the notion that the statute was constitutionally infirm. The Court held that "the potential reach of section 1346 is not 'virtually limitless.'" *Rybicki,* 354 F.3d at 142. The term

"scheme or artifice to defraud another of the intangible right of honest services" means, in private-sector cases, "a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a *material* misrepresentation made or omission of information disclosed to the employer or other person." *Rybicki,* 354 F.3d at 141–42 (emphasis added).

In adopting a "materiality" element to define and narrow the seemingly limitless application of 18 U.S.C. § 1346, however, the Second Circuit chose a test which was broader than the "reasonably forseeable harm" requirement articulated by the original *Rybicki* panel, which has been adopted by a majority of the courts of appeals to have decided this question.[13] *See, e.g., United States v. Vinyard,* 266 F.3d 320, 327–29 (4th Cir.2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2587, 153 L.Ed.2d 777 (2002); *United States v. Martin,* 228 F.3d 1, 17 (1st Cir.2000); *United States v. Pennington,* 168 F.3d 1060, 1065 (8th Cir. 1999); *United States v. Sun–Diamond Growers of California,* 138 F.3d 961, 973–74 (D.C.Cir.1998), *aff'd in part,* 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999); *United States v. Frost,* 125 F.3d 346, 369 (6th Cir.1997), *cert. denied,* 525 U.S. 810, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998); *United States v. deVegter,* 198 F.3d 1324, 1328–30 (11th Cir.1999), *cert. denied,*

---

**13.** *Rybicki* was the third circuit court of appeals to have held that "materiality" is a constitutional limitation on the applicability of the honest services statute. *See United States v. Cochran,* 109 F.3d 660, 667 (10th Cir.1997); *United States v. Thomas,* 96 F.3d 769, 775 (5th Cir.1996), *cert. denied,* 520 U.S. 1129, 117 S.Ct. 1275, 137 L.Ed.2d 351 (1997).

530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000). Significantly, however, even those circuit courts to have adopted the "reasonably foreseeable" harm standard have held that the honest services theory of fraud "neither requires an actual economic loss nor an intent to economically harm the employer." *Vinyard,* 266 F.3d at 329. "Thus, the reasonably foreseeable harm test is met whenever, at the time of the" scheme to defraud, "the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being." *Id.*

Notably, in reviewing the decisions of those courts that have adopted the "reasonably forseeable harm" standard (which as set forth above, is less restrictive than the materiality standard adopted in *Rybicki*), the Court finds that the indictment would withstand scrutiny under even this narrower standard. *A fortiori,* the indictment also passes muster under the more expansive materiality standard.

For example, in *deVegter,* the prosecution of investment bankers arose out of alleged corruption in the process by which Fulton county, Georgia selected an underwriter for refunding of municipal water and sewer bonds. *deVegter,* 198 F.3d at 1326. In reversing the district court's grant of the defendants' motion to dismiss the indictment for fraud under 28 U.S.C. § 1346, the appellate court held that it "sufficiently alleges that reasonably foreseeable economic harm to Fulton County was a consequence of [defendants'] fraudulent scheme. As described above, the purpose of Fulton County's employment of deVegter was to obtain an independent recommendation about the best underwriting proposals submitted. Corrupting the process by which this recommendation was made poses a reasonably foreseeable risk

of economic harm to Fulton County because *the best underwriter might not be recommended.* By affirmatively acting to recommend an inferior proposal over a superior one, deVegter inflicted reasonably foreseeable economic harm on Fulton County." *deVegter,* 198 F.3d at 1331 (emphasis added). Therefore, reasonably foreseeable harm, *i.e.,* economic harm, was the right of the County to choose a service provider of which it was deprived by the defendants' fraud. *deVegter* is precisely applicable here.[14]

■ Similarly, in *Frost,* university professors violated 18 U.S.C. § 1346 by knowingly accepting plagiarized dissertations from graduate students, defrauding the university of their fiduciary duties as professors by awarding fraudulently earned degrees and forseeably harming the university's reputation should the public learn of those facts. *Frost,* 125 F.3d at 352–53, 366–68. In affirming the convictions of defendants on virtually all counts following the district court's denial of defendants' motion to dismiss the indictment, the court held as follows: "[t]he inescapable conclusion is that defendants intended for Frost and Turner to breach the trust which the University had placed in them. Further, the evidence indicates that all defendants intended, much less reasonably contemplated, that the University would suffer a concrete business harm by unwittingly conferring an undeserved advanced degree on each student defendant." *Id.* at 369. *See also Sun–Diamond Growers,* 138 F.3d at 973–74 (a partner in a public relations firm violated § 1346 by funneling illegal campaign contributions to a candidate, for which it was reasonably foreseeable that the firm would suffer a significant loss in its primary asset, its public reputation); *United States v. Easton,* 54 Fed.Appx. 242,

---

**14.** As officers and directors of the Funds, defendants owed them a fiduciary duty which was set forth in ERISA, including discharging their responsibilities for the best interests of the Funds and without a conflict of interest. *See, e.g.,* 29 U.S.C. § 1101, 1104, 1106.

244, 2002 WL 31814951 (8th Cir.2002) ("financial or economic harm is not necessary to establish intent to defraud" under 18 U.S.C. § 1346 because "the scheme itself often serves as evidence of a defendant's intent to defraud") (unpublished opinion). These cases reveal that the "honest services" fraud is sufficiently pleaded where it alleges a perhaps unquantifiable harm inflicted on the defrauded entities which may, but does not necessarily result in, direct economic harm. Potential harm is the only prerequisite, which is satisfied in this case. This conclusion is bolstered by those courts which have applied the materiality standard, and held that a defendant who defrauds a party of the kind of services it anticipated receiving may be properly charged under 18 U.S.C. § 1346. *See, e.g., Gray*, 96 F.3d at 775 (fraud in connection with scheme to falsify academic records of basketball players recruited by a university deemed "material because Baylor did not get the quality student it expected").

Finally, it is worth noting that although the Second Circuit did not enthusiastically endorse an earlier decision at the margins of the application of the federal fraud statute, *United States v. Bronston*, 658 F.2d 920 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), calling it "atypical," it also failed to over-

rule or undermine its holding. *Rybicki*, 354 F.3d at 141 n. 16. In *Bronston*, a partner in a prestigious law firm accepted as a personal client, a business bidding for a city franchise, that was also sought by one of the firm's clients. *Bronston*, 658 F.2d at 930. Although the partner did not either personally represent his firm's client or use the firm's information about that client to help his personal client, the partner's "fraud" consisted of his breach of a fiduciary duty that he owed to his firm's clients. *Id.* The alleged harm—"that an adverse party was represented by the attorney it wanted"—did not cause monetary harm. *Rybicki*, 354 F.3d at 141 n. 16.[15] *Bronston* therefore provides further support for the conclusion that loss of honest services is chargeable as an offense under 18 U.S.C. § 1346 when it fundamentally changes the expectation of the bargain and unknowingly vests control of monetary matters in the hands of those, or their affiliates, responsible for the fraud.

Against this background, the Court holds that the indictment sets forth a chargeable offense under 18 U.S.C § 1346 when it alleges, with respect to the service contracts entered into due to defendants' conduct, the Funds (and its beneficiaries) were deprived of the following: (a) the right to the honest services of the defendants, union officials, purportedly acting as

---

**15.** The court defined two classes of cases typically found in prosecutions brought under 18 U.S.C. § 1346—a bribery or kickback case and a self-dealing case. *Rybicki*, 354 F.3d at 139–41. In a bribery or kickback case, "a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment." *Id.* at 139. The court noted that "[c]ases involving union officials tend to fit the pattern of the private-sector bribery cases." *Id.* at 140. In contrast, in self-dealing cases, "the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer." *Id.* Here, the allegations in the indictment support a finding that this is both a "kickback" and a self-dealing case. Defendants, on behalf of the Funds, are alleged to have received as a "kickback" lucrative union positions in return for granting certain service contracts to entities controlled by organized crime. Defendants are also alleged, among other things, to have withheld their connections to the mafia from the ILA and the Funds when they "secretly" orchestrated for contracts entered into by the Funds to be awarded to entities with mafia connections.

fund trustees, and (b) the Funds' right to control expenditures without the influence of any mafia connections.[16] Moreover, because the Court holds that Cernadas' conduct in this case falls within the scope of the fraud statutes as discussed above, his challenge to the constitutionality of 18 U.S.C. § 1346 as it is applied to him in this case is unavailing.

## III. Motion to Sever

Cernadas and Coffey claim that they were improperly joined in the indictment and that their trials should be severed pursuant to Fed.R.Crim.P. Rule 8(b), which permits joinder of multiple defendants if they are alleged to have participated in a common scheme or plan.[17] Specifically, Cernadas argues that he should be severed from the co-defendants, "regardless of whether and to what extent his joinder with them would prejudice him, unless the ... Indictment facially establishes that the extortion conspiracy count (in which he is not charged) and the mail and wire fraud conspiracy count (in which he is charged) constitute 'the same series of acts or transactions.'" (citation omitted). (Cernadas Mem. at 29). Coffey argues that severance is appropriate for him because he and Daggett will likely have mutually inconsistent defenses. (Coffey Mem. at 6).

My decision in *Bellomo*, 263 F.Supp.2d at 578, concisely sets forth the standard governing this issue. "Since 1993, determinations of severance motions have been informed by *Zafiro v. United States*, 506 U.S. 534, 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). That case is, by now, so thoroughly familiar to all who labor in the thorny thicket of the criminal law, that to recite its teaching at length would be superfluous. Suffice it to say, that joint trials are favored in the federal courts and should be held unless 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"

Therefore, the question presented "is whether the co-defendants 'participated' ... in the same series of acts or transactions constituting an offense or offenses." *United States v. Turoff*, 652 F.Supp. 707, 710 (E.D.N.Y.1987) (Glasser, J.), *order supplemented by*, 691 F.Supp. 607 (E.D.N.Y.1987). To meet this test, "the acts must be unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir.1989) (internal quotation and citation omitted).[18]

---

**16.** In this respect, the indictment satisfies the standard of an out-of-jurisdiction district court case which defendants cite in support of their argument. *See, e.g., United States v. Campbell*, 291 F.Supp.2d 547, 555 (E.D.Mich. 2003) ("Accordingly, in order to be convicted under the honest services doctrine, (1) Defendants must have had a fiduciary duty to the membership of Local 594, (2) they must have intended to breach their fiduciary duty, and (3) they should have reasonably foreseen that the breach would create an economic risk to the membership of Local 594").

**17.** This rule provides that the indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or

transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed.R.Crim.P. 8(b).

**18.** Cernadas argues that despite the plain language used in *Attanasio* which sets forth a disjunctive test governing "the same series of acts or transactions" standard, interpreted "to mean that the acts must be unified by some substantial identity of facts or participants *or* arise out of a common plan or scheme, it is actually a conjunctive test." (Cernadas Mem. at 27). However, Cernadas does not point to any precedent in the Second Circuit applying this "conjunctive test" and the Court has not found any.

■ The Government persuasively argues that both counts of the indictment arise out of the Genovese family's control over the ILA and the Funds through individuals such as defendants. The alleged victims of this scheme were different. On the one hand, they were businesses interested in operating on the piers in New York, New Jersey and Miami free from the control of the Genovese family, and on the other hand, the ILA, its locals and their Funds, which the Genovese family controlled, either directly or indirectly, through the appointment of officers who were loyal to it. *See generally* Indictment; Gov't Mem. at 66–67. I find, therefore, that severance is not appropriate in this case. Moreover, if the Court severed Cernadas, the same case would be tried twice. The same witnesses and the same documents would be presented in each. Furthermore, I am persuaded by the authority in this circuit which recognizes a strong interest in conducting joint trials for persons who have been jointly indicted.

With respect to Coffey, he argues that his motion should be granted because he may have antagonistic defenses to Daggett. However, a "simple showing of some antagonism between defendants' theories of defense does not require severance. The defense of a defendant reaches a level of antagonism ... that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant." *Turoff*, 652 F.Supp. at 711 (citation and internal quotation omitted). Coffey has not alleged any defense, let alone an antagonistic one, which would satisfy his "difficult burden of demonstrating sufficient prejudice to" warrant severance. *Id.* at 712 (quoting *United States v. Finkelstein*, 526 F.2d 517, 525 (2d Cir.1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976)).

■ In the alternative, Cernadas argues that the Court should grant severance based on Fed.R.Crim.P. 14. "A defendant seeking a Rule 14 severance bears the heavy burden of showing that he will be substantially prejudiced by a joint trial. Substantial prejudice means prejudice so egregious that a defendant's rights cannot be adequately protected by admonitory instructions to a jury and the denial of a severance would deprive him of a fair trial." *Albunio*, 1992 WL 281037, at * 2. Cernadas argues that "[b]ecause he is not charged in the extortion conspiracy count," he "faces a grave risk of unfair prejudice from a joint trial." (Cernadas Mem. at 42). However, if that argument had merit, then it would divest the language in Fed. R.Crim.P. 8(b) that "[a]ll defendants need not be charged in each count" of all meaning. Proffered generalized assertions of prejudice cannot support a claim that Cernadas' severance motion should be granted.

To the extent that Cernadas' argument that he will suffer prejudice absent severance is bottomed on the "spillover" effect of being lumped together in the same case with the co-defendants, *see* Cernadas Mem. at 42–43, the Second Circuit has held that there is some risk of spillover in any trial of multiple defendants but that risk is deemed to be acceptable given the judicial economies that result from joinder. *United States v. Carpentier*, 689 F.2d 21, 27 (2d Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). The limiting instructions which may be required during the course of the trial will, in any event, be sufficient to protect Cernadas from prejudicial spillover from evidence admissible only against the other co-defendants.

Pursuant to Cernadas's request, this motion is denied without prejudice to allow him to sustain his burden of proof on this

issue after his full review of the documents and information produced during discovery consistent with the factors which this Court previously articulated in *United States v. Upton*, 856 F.Supp. 727, 736 (E.D.N.Y.1994) (Glasser, J.). *See* Cernadas Mem. at 43 & n. 7.

Daggett filed a motion for severance on February 18, 2005, well after the briefing and argument on the other pending motions was completed. Daggett claims that relying on the Court's prior order that the trial in this case would commence on March 21, 2005, his counsel scheduled a vacation beginning on June 13, 2005, and his son set a June 25, 2005 wedding date. In support of his application, Daggett further asserts that he is ready to proceed with the trial on March 21, 2005, and that there is no reason for further delay. Accordingly, Daggett requests that he be severed from the other defendants so his trial can proceed forthwith. Consistent with the principles discussed above, the Court denies Daggett's motion because his proffered reasons for severance are neither recognized nor are they persuasive.

### IV. Motion for Bill of Particulars

Fed.R.Crim.P. 7(f) allows a district court to require the "filing of a bill of particulars." "A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Chen*, 378 F.3d 151, 163 (2d Cir.2004) (citing and quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999)), *cert. denied*, 125 S.Ct. 512 (2004). Moreover, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Id.* (citation and internal quotation omitted). Indeed, "[t]he proper scope and function of a bill of particulars is not to obtain disclosure of evidence or witnesses to be offered by the Government

at trial" and an indictment is sufficient provided that "it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy." *United States v. Salazar*, 485 F.2d 1272, 1277–78 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). Accordingly, a demand for a bill of particulars should not be granted unless, in the court's discretion, "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.1990) (quotation and internal citation omitted), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

 Cernadas and Daggett argue that the Court should grant their motion for a bill of particulars because otherwise it will be impossible for them to prepare a defense. (Cernadas Mem. at 46; Daggett Mem. at 1–2). The information sought by Cernadas set forth in a letter from his counsel to the Government, dated October 22, 2004, comprises twenty-two different categories of information, and would require the Government to define and explain virtually each term and phrase used in the indictment. (Cernadas Mem. Exh. A; Reply Mem. at 22–24). Daggett, with no effort at explanation, appears to seek the same information. (Daggett Mem. at 2). Cernadas' and Daggett's detailed requests for information amount to requests for specific evidence to be used by the Government at trial, which is not the purpose of a bill of particulars. Moreover, the Government has represented that it has disclosed during discovery at least some of the information requested by defendants. (Gov't Mem. at 78). In its opposition memorandum, the Government provides defendants with a detailed statement of facts which it contends it will prove at

trial. (*Id.* at 4–28). Defendants will thus be unable to argue in good faith that the failure to provide a bill of particulars "'impermissibly" shifted "the burden of proof" to them. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir.1987).

In reply, defendants focus their request for a bill of particulars on the identity of their co-conspirators, among others. (Cernadas Reply Mem. at 22). Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved. So long, as here, an indictment and discovery sufficiently enable defendants to avoid surprise and prepare for trial, a bill of particulars is not warranted. *See United States v. Torres*, 901 F.2d 205, 233–234 (2d Cir.1990) (upholding district court's denial of a bill of particulars where "a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits" was supplied); *United States v. Rodriguez*, 1999 WL 820558 at *2 (S.D.N.Y. Oct.13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial"). Moreover, the "temptations of perjury, subornation and intimidation are ever present" in this case. *United States v. Sindone*, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) ("The government is not required to turn over information that will permit a defendant to preview the government's case and tempt him ... to see to it that the government's proof is not presented"); *Albunio*, 1992 WL 281037, at *3 ("The refusal of a district court to direct the filing of a bill of particulars as to the names of unindicted co-conspirators or as to the names of witnesses is not an abuse of discretion"); *United States v. Glisson*, 2003 WL 21709502, at *3 (S.D.N.Y. July 23, 2003)

("denying bill of particulars seeking names of all co-conspirators and aiders and/or abettors in light of routine denial of such requests in case law and the sufficiency of information contained in the indictment and obtained through discovery") (citations omitted).

Against this background, the Court finds that the indictment sufficiently informs the defendants of the nature of the charges against them. While the information defendants seek might be useful or helpful, in light of the ample notice and specificity provided by the indictment and additional evidence and information supplied, defendants' motion for a bill of particulars is denied with prejudice. To hold otherwise, would convert a motion for bill of particulars into a motion for wide-sweeping and burdensome discovery which is plainly not contemplated by Fed.R.Crim.P. 7(f). *See also United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y.1987) ("a bill of particulars [in not] a general investigative tool for the defense, or as a device to compel disclosure of the Government's evidence or its legal theory prior to trial"), *aff'd*, 875 F.2d 857 (2d Cir.1989), *cert. denied*, 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989); *United States v. Bin Laden*, 92 F.Supp.2d 225, 233 (S.D.N.Y.2000) (stating that, in assessing the need for a bill of particulars, "the court must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery").

## V. Motion To Strike Surplusage in Indictment

Defendants move to strike the allegations set forth in the introduction to the indictment that relate to the organizational structure of the Genovese family, for example, paragraph 4, which states that "[f]rom the 1980's through the date of the filing of this ... Indictment, the boss of the Genovese family was Vincent Gigante,

also known as 'Chin.' " Indictment ¶ 4. Defendants also move to strike the allegation which states that they owed the Funds a fiduciary duty "without regard to their own personal gain or that of organized crime." Indictment ¶ 9. With respect to the allegations relating to the structure of the Genovese family, defendants assert that the indictment's "gratuitous inclusion" of inflammatory terms relating to "organized crime" are irrelevant to the crimes with which they are charged. (Cernadas Mem. at 47). Defendants also state that the allegation describing the fiduciary duty which they owed to the Funds misleads the jury into believing that defendants' decisions could not benefit them even if they were in the best interest of the Funds. (*Id.*)

Pursuant to Fed.R.Crim.P. 7(b), it is well established that the district court is empowered to strike irrelevant portions of an indictment. *See United States v. Miller*, 471 U.S. 130, 144–45, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *United States v. Wilner*, 523 F.2d 68, 72 (2d Cir.1975). A motion to strike surplusage from the indictment will be granted only when the movant sustains the heavy burden of demonstrating that the challenged terms are: 1) irrelevant to the crime charged; and 2) inflammatory and prejudicial. *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001), *cert. denied*, 535 U.S. 949, 122 S.Ct. 1344, 152 L.Ed.2d 247 (2002). In light of this standard, "if evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990) (internal citation and quotation omitted). Given this exacting standard, such motions are rarely granted. *See United States v. DePalma*, 461 F.Supp. 778, 797 (S.D.N.Y.1978).

■ The Court finds that the introductory paragraphs of the indictment describing the structure of the Genovese crime family are relevant to the crimes with which defendants are charged because the extortion conspiracy and mail and fraud scheme allegedly occurred by virtue of defendants' relationships to the Genovese family. *See United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir.1996) (finding that defendants' cocaine-related activity was clearly relevant evidence of the organizational structure and method of operation of their heroin conspiracy). Moreover, in their brief, the Government states that it will prove the allegations in the introduction to the indictment at trial as part of its case. (Gov't Mem. at 63–64).

■ Further, with respect to the allegations relating to the fiduciary duty that defendants owed the Funds, the language in the indictment sets forth a correct recitation of the relevant legal standard. *See, e.g.*, Black's Law Dictionary at 545 (8th ed.) (fiduciary duty is a "duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a … [union] officer) to the beneficiary (such as … a [union member]; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person")); *In re Eberhart*, 171 Misc.2d 939, 942, 656 N.Y.S.2d 159, 161 (1997) ("Simply put, such a distribution, prompted by the trustee's self-interest, would be a breach of his fiduciary duty and would give rise to a right to recovery on behalf of the trust from the trustee individually"). While it may be axiomatic that a fiduciary, acting in the best interest of the beneficiary, may also benefit personally, the language in the indictment does not state otherwise. Accordingly, the Court denies defendants' motion without prejudice.[19]

---

**19.** The Court denies defendants' motion without prejudice so that it can be renewed at trial

if appropriate. If the evidence presented at

## VI. Motion for Pre–Trial Hearing on Admissibility of Co–Conspirator Statements

■■■ Defendants move pursuant to Fed.R.Evid. 104(a) and 801(d)(2)(E) for a pre-trial hearing as to whether out-of-court assertions of alleged co-conspirators will be admissible at trial. (Daggett Mem. at 5). The Court will resolve any dispute concerning the admissibility of a co-conspirator statement offered by the Government under Fed.R.Evid. 801(d)(2)(E) at trial, consistent with its well-established practice. The Second Circuit expressly has approved the practice of admitting such statements at trial subject to the Government's introduction of evidence which will support the findings required by *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *See United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir.1993). Accordingly, statements proffered as co-conspirator's statements will be admitted at trial on a conditional basis, subject to the Court's finding, by a preponderance of the evidence, that such statements are admissible under Fed. R.Evid. 801(d)(2)(E).[20] This requires a finding that a conspiracy existed, that the defendant was a part of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. *See Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. 2775.

Defendants' motion to the Court to conduct a pre-trial hearing on the issue of the admissibility of co-conspirator statements under Fed.R.Evid. 801(d)(2)(E) is therefore denied with prejudice.

## VII. Motion to Mark This Case as Related to *United States v. Gotti* and Not *United States v. Bellomo* and For Production of Grand Jury Minutes

Defendants argue that in a transparent effort at judge shopping, the Government designated this case as related to *United States v. Bellomo*, 02 CR 140(ILG) when it should be properly designated as related to *United States v. Gotti*, 02 CR 606(FB). According to Rule 50.3(a) of the guidelines for the division of business among district judges in the Eastern District (the "Guidelines"), "a case is 'related' to another for purposes of the [Guidelines] when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge." Pursuant to Rule 50.3(c) of the Guidelines, with respect to criminal cases, a case is "related" when a party makes an application on ten days notice to its adversary (as the Government did here), and the Court is satisfied that "a substantial saving of judicial resources is likely to result from assigning both cases to the same judge."

Defendants argue that Rule 50.3(a) of the Guidelines was not satisfied. In support of this position, they provide the Court with the Government's closing statement in *United States v. Gotti* and argue

---

trial contradicts the challenged language in the introductory paragraph of the indictment (or that set forth in paragraph nine), or renders it irrelevant, the Court will re-consider this motion before submitting the indictment to the jury.

**20.** If the Court determines after conditionally admitting the alleged co-conspirator statements that they were not made in furtherance

of a conspiracy, it is required to instruct the jury to disregard the statements, or, if those statements were "so large a proportion of the proof as to render a cautionary instruction of doubtful nullity," it will declare a mistrial. *Tracy*, 12 F.3d at 1199 (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)).

that it supports their position that this case is identical to *Gotti*. Specifically, they argue that *Gotti* involved the same co-conspirators as in this case, and the allegations in that case are similar to the allegations in the indictment here.

█ Defendants' application is without merit for at least two reasons. First, Rule 50.4 of the Guidelines instructs that "[n]o case shall be reassigned except in the interest of justice and the efficient disposition of the business of the court." Here, the parties have already undertaken extensive discovery, have filed voluminous substantive motions, and a trial has been scheduled for May 31, 2005. Even assuming that defendants have shown that this case is properly related to *Gotti* (which they have not done), they have failed to persuade the Court that transferring the case at this stage would either be in the interest of justice or would result in the efficient disposition of the business of the Court.

Second, a review of the indictments in *Bellomo, Gotti* and this case, reveals that this case is related to *Bellomo* in material respects, involving the same allegations and many of the same co-conspirators. In fact, count one of the indictment is virtually identical to count three of the indictment in *Bellomo*. The Court thus denies defendants' motion to designate this case as related to *Gotti*.

█ Defendants also seek inspection of the grand jury minutes claiming that the Government's investigation in this case terminated well before July, 2004 and before the indictment was issued. (Daggett Mem. at 2–4). However, because of the "indispensable secrecy of grand jury proceedings," *United States v. Johnson,* 319 U.S. 503, 513, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943), disclosure is permissible only "where there is a compelling necessity." *United States v. Procter & Gamble, Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d

1077 (1958). Grand jury proceedings carry a presumption of regularity and a review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct. *See Costello,* 350 U.S. at 363, 76 S.Ct. 406; *Torres,* 901 F.2d at 232–33 (quoting *Hamling v. United States,* 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)); *United States v. Nunez,* 2001 WL 91708, at *11 (S.D.N.Y. Feb. 1, 2001) (denying request for production of minutes to defendant and for in camera review because defendant only presented a "bald allegation" that a review of the minutes was necessary to ensure that the grand jurors were properly instructed on the controlling law). Here, as the defendants have not identified any particularized need for the grand jury materials they seek, their motion for disclosure is denied.

## VIII. Motion To Require the Government to Provide Defendants With List of Witnesses Thirty Days Prior to Trial

"Given the magnitude of the investigation, the indictment and the anticipated trial," (Daggett Not. Of Motion), defendants seek an order from the Court requiring the Government to provide a witness list thirty days prior to trial, and a supplemental witness list seven days before trial.

Although its source has been debated, "[t]he general discretion of district courts to compel the [G]overnment to identify its witnesses is acknowledged widely." *See United States v. Cannone,* 528 F.2d 296, 299 (2d Cir.1975); *United States v. Falkowitz,* 214 F.Supp.2d 365, 395 (S.D.N.Y. 2002) (ordering prosecution to produce witness list thirty days before trial, in light of size and complexity of the case and non-violent nature of the offense charged); *United States v. Rueb,* 2001 WL 96177, at *6 (S.D.N.Y. Feb. 5, 2001) (witness list

**126**

required to be turned over to defendants due to voluminous documents produced and extended time period covered by indictment).

Here, defendants have failed to make a particularized showing of need for the Government's witness list to be produced thirty days prior to trial. Indeed, Daggett's counsel has not provided any legal or factual support for his position, relying instead on a conclusory statement in the notice of motion as set forth above. For this reason alone, defendants' motion is denied. Moreover, the Court notes that the possible disclosure of the Government's witness list well in advance of trial "should be balanced against the possible dangers accompanying disclosure (*i.e.*, subornation of perjury, witness intimidation, and injury to witnesses"). *United States v. Cafaro*, 480 F.Supp. 511, 520 (S.D.N.Y. 1979). Here, as the Government points out, it is too early for the Court to make such a determination since the trial is more than two months away. Therefore, the Court denies defendants' motion without prejudice, entitling defendants to renew their request if they believe they have a sufficient basis for doing so.

### CONCLUSION

For the foregoing reasons, defendants' pre-trial motions are denied.

SO ORDERED.